## In the
## United States Court of Appeals
### For the Seventh Circuit

———————

No. 07-1755

DISABILITY RIGHTS WISCONSIN, INC.,

*Plaintiff-Appellant*,

*v.*

WALWORTH COUNTY BOARD OF SUPERVISORS,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06 C 813—**Rudolph T. Randa**, *Chief Judge.*

———————

ARGUED NOVEMBER 9, 2007—DECIDED APRIL 14, 2008

———————

Before BAUER, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Disability Rights Wisconsin, Inc. ("DRW") is a non-profit corporation created under Wisconsin law in order to "[p]ursue legal, administrative and other appropriate remedies to ensure the protection of the rights of persons with developmental disabilities or mental illness." Wis. Stat. § 51.62(3)(a)(1). DRW filed suit against the Walworth County Board of Supervisors ("Board of Supervisors") alleging that the Board of Supervisors' operation of a separate educational facility for disabled children violated Title II of the Americans with

Disabilities Act and Section 504 of the Rehabilitation Act of 1973. The Board of Supervisors moved to dismiss, arguing that DRW lacked standing to bring suit. The district court granted the motion. DRW appeals the district court's dismissal arguing that it has both standing to sue on its own behalf and associational standing to sue on behalf of its members. We affirm.

I.

When reviewing the grant of a motion to dismiss "we take as true all well-pleaded factual allegations in the complaint and make all plausible inferences from those allegations in the plaintiffs' favor." *Levy v. Pappas*, 510 F.3d 755, 764 (7th Cir. 2007). The allegations set forth in DRW's First Amended Complaint present the following facts. Walworth County, Wisconsin has a publicly funded program known as the Walworth County Children with Disabilities Education Board ("Disability Board") which has as its purpose educating children with disabilities. The Disability Board, which undertakes such responsibilities as designing and administering curricula, was created by the Board of Supervisors according to Wisconsin Statute § 115.817,[1] and acts under the Board of Supervisors' supervision and control. One of the means by which the Disability Board fulfills its mandate is by operating the Lakeland School, described by DRW as "a restrictive,

---

[1] Section 115.817 provides, among other things, that county boards of supervisors may establish special education programs for school districts, and those programs may provide for "one or more special schools, classes, treatment or instruction centers." Wis. Stat. § 115.817(2)(a)-(b).

segregated educational environment that exclusively educates disabled students." The Lakeland School opened in 1950 with fourteen students, and currently enrolls 260, or eleven percent, of the 2,300 students receiving special education services in Walworth County. DRW points out that Wisconsin's statewide county average of disabled children educated in a separate school is less than one percent, and alleges that the Lakeland School is a major factor in the higher rate at which children are separately educated in Walworth County. According to DRW, the Disability Board has stated that only a small number of Lakeland's students have "significant needs," and DRW therefore believes that a "large majority" of Lakeland students would be able to be educated in a more integrated environment. DRW alleges, however, that because of the Disability Board's funding and contract agreements, virtually all of the special education employees in Walworth County are employed by the Disability Board, and there is a disincentive for the school districts to fund and staff special education programs at their "non-segregated" schools.

The incident that finally led DRW to file suit was the Board of Supervisors' approval of Resolutions 84-02/06 and 83-02/06 which provided for bonding in the amount of twenty-two million dollars. The Board of Supervisors endorsed the use of these funds to construct a new Lakeland School. DRW alleges that the Board of Supervisors intends to construct a bigger facility, and that when the new building is completed, the number of disabled students able to attend the Lakeland School will increase significantly.

To prevent this action by the Board of Supervisors, DRW brought suit on August 2, 2006, under Title II of the

Americans with Disabilities Act, 42 U.S.C. §§ 12131 and
12132 ("ADA"), and Section 504 of the Rehabilitation Act
of 1973, 29 U.S.C. § 794. DRW alleged that the effect of
directing resources to the Lakeland School is that a dis-
proportionate number of disabled children end up edu-
cated there, and they are therefore not educated "in the
most integrated environment to the maximum extent
appropriate." The Board of Supervisors moved to dis-
miss, claiming that DRW lacked standing to pursue
these claims, or in the alternative, that it had failed to
exhaust its administrative remedies. On March 14, 2007, the
district court granted the motion, concluding that DRW
lacked associational standing and declining to reach
the exhaustion argument. DRW appeals this dismissal,
arguing that it has both standing to sue on its own behalf,
as well as associational standing to pursue claims on be-
half of its members.

## II.

Whether a party has standing to bring suit is a ques-
tion of law we review de novo. *Winkler v. Gates*, 481 F.3d
977, 982 (7th Cir. 2007). The party seeking to invoke fed-
eral jurisdiction, here DRW, has the burden of estab-
lishing that it meets the requirements of standing. *DH2,
Inc. v S.E.C.*, 422 F.3d 591, 596 (7th Cir. 2005). The stand-
ing requirements under Article III of the Constitution are
well settled: "injury in fact, a causal connection between
the injury and the defendant's conduct, and likely
redressability through a favorable decision." *Winkler*,
481 F.3d at 979 (citing *Lujan v. Defenders of Wildlife*, 504
U.S. 555, 561-61 (1992)). Prudential standing, on the other
hand, "embodies 'judicially self-imposed limits on the
exercise of federal jurisdiction.'" *Elk Grove Unified Sch.*

*Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).[2] Because the prudential standing analysis assumes satisfaction of the Article III requirements, we turn first to the requirements set out in *Lujan*.

In considering whether DRW has alleged an injury in fact, we recall that "[a]t the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice . . . ." *Lujan*, 504 U.S. at 561. DRW asserts in its brief that when Walworth County constructs the new Lakeland School, it will suffer injury because it will have to devote more of its resources to representing disabled children who want to avoid becoming part of the larger group that will be placed at the facility. Presumably this claim anticipates that there will be children assigned to the Lakeland School whose parents object to that placement and turn to DRW for help. Expenditure of additional resources by a disability rights advocacy group in representing disabled members as the result of governmental conduct has been deemed, in some circumstances, to amount to an injury in fact. *See Pennsylvania Protection and Advocacy, Inc. v. Houston*, 136 F. Supp. 2d. 353, 361 (E.D. Pa. 2001) (finding that a disability rights

---

[2] The Supreme Court has never given exhaustive definition to the various limitations making up prudential standing. *Newdow*, 542 U.S. at 12. It has stated, however, that "prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.' " *Id.* (quoting *Allen*, 468 U.S. at 751).

advocacy group had standing to sue in its own right where it alleged that it spent time, money, and resources advocating for disabled persons affected by Pennsylvania's policies). Likewise, we recently held that the Democratic party had standing to seek an injunction against enforcement of a law requiring voters to present a photo identification before voting because the law would compel "the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law . . . ." *Crawford v. Marion County Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *cert. granted*, 128 S. Ct. 33 (2007).

Despite these court decisions arguably supporting DRW's assertion regarding expenditure of resources, its argument fails because what DRW presents in its brief regarding expenditure of resources is nowhere alleged in its First Amended Complaint. To sufficiently set forth an injury in fact, DRW would need to make allegations that advocating on behalf of children wrongfully placed in the Lakeland School was going to cause it to expend more of its time, money and resources. Instead, DRW alleges how the new Lakeland School will affect the disabled children of Walworth County, and repeatedly claims to bring the suit "on [their] behalf." Furthermore, the only rights DRW claims are infringed by the Board of Supervisors' conduct are those of Walworth County's disabled children. Finally, the only relief DRW seeks on its own behalf in its Prayer for Relief are the attorneys' fees and costs incurred in filing this action. "Ordinarily . . . the allegation [of a reasonable probability of suffering tangible harm] is enough," *MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 745 (7th Cir. 2007), however, DRW made no such allegation in its First Amended

Complaint. While DRW compares itself to the plaintiff in *Pennsylvania Protection and Advocacy*, that case provides it no support because the plaintiff there actually alleged its own injury, whereas DRW did not. *Pennsylvania Protection and Advocacy, Inc.*, 136 F. Supp.2d at 361 ("Plaintiff states that it has spent 'its time, money, and resources to advocate for an end to the waiting list for community services for Pennsylvanians with mental retardation, . . . [and] to counsel and assist the families of individuals with mental retardation who have been unable to access services . . . .") (citing plaintiff's complaint). Indeed, DRW's allegations as recounted above are actually inconsistent with any attempt to seek relief on its own behalf. Accordingly, we conclude that it did not meet the constitutional requirements for standing to sue in its own right.[3]

DRW also argues that it has associational standing to bring suit on behalf of school-aged disabled children in

---

[3] DRW also argues that its very existence as provided for in Section 51.62 of the Wisconsin Statutes bestows standing to bring suit on its own behalf. DRW supports this assertion by pointing out that in order for Wisconsin to receive federal funds for disabilities services, the Developmental Disabilities Act requires that it "have in effect a system to protect and advocate the rights of individuals with developmental disabilities," 42 U.S.C. § 15043(a)(1), a mandate Wisconsin fulfilled by enacting Section 51.62. However, DRW cites no authority establishing that these statutes have any bearing on the constitutional standing considerations, and we decline to give them such effect. The requirement that a plaintiff allege an injury in fact has as its source Article III of the Constitution. No statutory regime can override a constitutional requirement in order to repair insufficient allegations of injury.

Walworth County. An organization has associational standing, and may bring suit on behalf of its members, when (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claims asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The third requirement does not derive from the Constitution. Instead, it is a judicially imposed limitation, *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 556-57 (1996), which may be overridden by Congress. *Family & Children's Ctr., Inc. v. School City of Mishawaka*, 13 F.3d 1052, 1059 (7th Cir. 1994). The Board of Supervisors concedes both that Congress eliminated the third requirement in enacting the Developmental Disabilities Act, 42 U.S.C. § 15043(a), and that the interests DRW seeks to protect fit within the Act's purpose. Accordingly, the dispute between the parties regarding associational standing boils down to the first factor set out in *Hunt*, namely whether any DRW members have standing to sue in their own right.

The first *Hunt* factor satisfies Article III standing concerns by "requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United Food*, 517 U.S. at 555. This requirement, however, still allows for the member on whose behalf the suit is filed to remain unnamed by the organization. *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999). Even taking that allowance into consideration, we do not find any allegations made by DRW sufficient to establish that any of its members have sus-

tained their own injury in fact, caused by the Board of Supervisors' conduct, and able to be redressed by a favorable decision. Rather, DRW describes the high rates of separate education in Walworth County, states that the presence there of the Lakeland School is "a major factor" contributing to those higher rates, and then alleges that "the number of potential students with disabilities who can enroll at Lakeland School will increase significantly" upon the new school's completion. Based on this "potential" enrollment increase and the funds that go to the Lakeland School, DRW alleges that the Board of Supervisors fails to educate disabled students in the most integrated environment to the maximum extent appropriate, and discriminates against these students based upon their disability.

As noted above, we must take these allegations as true, and draw the plausible inferences from them in DRW's favor. *Levy*, 510 F.3d at 764. Even employing this standard, however, we do not see how the allegations set forth above establish that any DRW member has standing. As an initial matter, no disabled child will be placed in the Lakeland School simply because there is more room there. This fact is even alluded to by DRW when it speaks of increased enrollment as a "potential" outcome of enlarging the Lakeland School. As pointed out by the Board of Supervisors in its brief, placement of disabled students takes place according to the detailed procedure set forth in the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA"). Under the IDEA, states are responsible for providing "a free appropriate public education" to disabled children. 20 U.S.C. § 1412(a)(1)(A). They should seek to do this, however, in the "least restrictive environment," meaning, "[t]o the maximum

extent appropriate, children with disabilities . . . [should be] educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A).[4] This placement is achieved by devising an Individualized Education Program ("IEP") for each disabled child. 20 U.S.C. § 1412(a)(4). An IEP is developed by an "IEP Team," consisting of no less than five people, made up of the child's parent and a host of educators. 20 U.S.C. § 1414(d)(B)(i)-(vii). If a parent feels proper procedures were not followed in devising an IEP, a challenge may be filed. 34 C.F.R. § 300.507(a)(1).[5] Taking this process into account, we cannot see that any student has sustained, or imminently will sustain, the injury of not being educated in the least restrictive environment based simply upon the Board of Supervisors' decision to fund construction of the new Lakeland School facilities. Moreover, if disabled students are being improperly placed, that injury may be redressed through the statutory challenge process set forth above, not by stopping construction of the new facility. This is particularly so when the people of Walworth County, through their elected representatives, not only decided to build the new Lakeland School, but decided to fund its construction to the tune of twenty-two million dollars.

Another reason DRW's First Amended Complaint does not establish standing for any of its members is that, as

---

[4] The result of this directive is sometimes referred to as "mainstreaming."

[5] It is noteworthy that DRW has chosen to avoid this traditional, albeit tedious, administrative path to challenging an undesirable IEP. Instead, DRW attempts to bring about a generalized "least restrictive environment" absent the assistance, or alleged desire, of any individual child or parent.

stated by counsel for the Board of Supervisors at oral argument, the Lakeland School is a popular institution. We doubt the Board of Supervisors could allocate twenty-two million dollars to it if it were not. The Board of Supervisors' attorney indicated that the reason the Lakeland School has so many students is that parents like it, and many families move to Walworth County to take advantage of the educational opportunities the Lakeland School presents their children. While we do not weigh these assertions against the allegations of DRW's First Amended Complaint, they make clear why simply funding an enlarged Lakeland School does not give rise to a reasonable inference that disabled students are being injured by the Board of Supervisors. If there are students who have actually suffered an injury because of the Board of Supervisors' decision, they remain free to bring suit on their own behalf, or represented by DRW. We conclude, however, that DRW's First Amended Complaint does not allege the current existence of any such student.

Finally, an organization known as the National Disability Rights Network ("NDRN") filed an Amicus Curiae brief in support of DRW wherein it argued that a circuit split exists as to whether an association can bring suit on behalf of unnamed individuals. Specifically, NDRN asserts that the Ninth and Eleventh Circuits, with whom they urge us to join, allow an association to bring such a suit, *see Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2002) and *Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999), while the Fifth Circuit disallows it. *See Ass'n for Retarded Citizens v. Dallas County*, 19 F.3d 241 (5th Cir. 1994). Our review of these cases, however, reveals that the only issue on which they split is whether disabled persons are "members" of disability rights advocacy groups for the

purpose of the first *Hunt* element. *Compare Ass'n for Retarded Citizens*, 19 F.3d at 244 (concluding that the advocacy group does not have members on whose behalf it can bring suit), *with Or. Advocacy Ctr.*, 322 F.3d at 1110 (concluding that disabled persons are the functional equivalent of members for the purpose of an associational standing analysis) and *Doe*, 175 F.3d at 885 (same). That issue is not present in this case. In fact, the Board of Supervisors expressly concedes that DRW is an advocacy group able to bring suit on behalf of its members. Nobody denies that DRW has a role to play as an advocate on behalf of the disabled. However, advocacy is only appropriately—and constitutionally—undertaken on behalf of another when that other has suffered an injury. Because DRW's First Amended Complaint does not identify any Walworth County disabled student with standing to bring suit based on the Board of Supervisors' conduct, DRW does not satisfy the first requirement of *Hunt*, and therefore has not established associational standing.

## III.

We conclude that DRW has not alleged any injury in fact to itself based upon the conduct of the Board of Supervisors, and therefore has not established that it has standing to sue on its own behalf. Additionally, DRW has not identified any member with standing to sue, and therefore has not established that it has associational standing to sue on behalf of its members. Accordingly, we AFFIRM the district court's dismissal of DRW's suit.