In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2314

MILWAUKEE POLICE ASSOCIATION AND
MELISSA RAMSKUGLER,

*Plaintiffs-Appellants,*

*v.*

BOARD OF FIRE & POLICE COMMISSIONERS OF
THE CITY OF MILWAUKEE, EDWARD FLYNN, AND THE
CITY OF MILWAUKEE,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 09-C-1192—**Rudolph T. Randa**, *Judge.*

ARGUED SEPTEMBER 25, 2012—DECIDED FEBRUARY 26, 2013

Before KANNE, TINDER, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* In June 2009, Melissa Ramskugler found herself trapped in a frustrating liminal state. She had satisfied the State of Wisconsin's requirements to become a police officer but had not yet completed the additional probationary period mandated by Milwaukee's Board of Fire & Police Commissioners. As a result,

when the Board fired Ramskugler, it claimed it did not need to follow Wisconsin's statutorily prescribed procedures for terminating police officers. Feeling that she was treated unfairly, Ramskugler sued. The Milwaukee Police Association, the union representing Milwaukee officers, joined her. Together, they claimed that Ramskugler was wrongfully deprived of property without due process. After the district court granted summary judgment in favor of the defendants, the plaintiffs appealed. Prior to oral argument, however, Ramskugler signed a complete settlement and release. The union never had standing to bring suit on its own behalf, and any claims previously derived from its membership are now moot. Accordingly, we dismiss this appeal.

## I. BACKGROUND

In Wisconsin, police recruits must successfully complete a period of probation before becoming fully qualified officers. Statewide requirements are set by the Law Enforcement Standards Board ("LESB") and include over 400 hours of training. *See* Wis. Stat. § 165.85. After a recruit completes this curriculum, the local police department requests that the LESB certify the recruit as a "law enforcement officer." In the City of Milwaukee, however, LESB certification does not end the probationary period. As a city with a population over 150,000 people, Milwaukee is classified under Wisconsin law as a "1st class" city. *See* Wis. Stat. § 62.05(1)(a). First class cities have their own boards of fire and police commis-

sioners, which have the authority to "adopt rules to govern the selection and appointment" of city police officers. Wis. Stat. § 62.50(3)(b). Milwaukee's Board has interpreted that provision as conveying authority to adopt more demanding probation requirements than those mandated by the LESB. Specifically, no new recruit in Milwaukee becomes a full officer until she has accrued sixteen months of "actual active service." Board Rule XI, Section 7(a). Because the LESB curriculum is often completed in less than sixteen months, a police recruit in Milwaukee can remain in probationary status even after satisfying the statewide requirements.

Melissa Ramskugler found herself mired in that precise predicament. Ramskugler's probation with the Milwaukee Police Department ("the Department") began on October 8, 2007. Just three days later, Ramskugler injured her right knee during training. To give her re-cuperation time, the Department assigned Ramskugler to clerical duties for approximately one month. Then, in November, she was given 2.5 months of leave for surgery on the injured knee. Ramskugler subsequently returned to duty but remained in a clerical capacity for a number of months. In that time, she obtained medical clearance for unrestricted duty and then had to wait for the next recruit class to begin.

On June 8, 2008, Ramskugler started training with that class. Unfortunately, two weeks before graduating in November, Ramskugler re-injured the same knee. She had already completed the course requirements, how-ever, so the Department still sent her name to the LESB

for certification. After more leave and a second surgery on her knee, Ramskugler returned to clerical duties on January 27, 2009. Then, in March, the LESB certified her. At that point, Ramskugler was a "law enforcement officer," as defined by the LESB. Yet, she was still on probation in the eyes of the Milwaukee Board. The Board did not consider Ramskugler's time performing clerical duties as "actual active service." Therefore, she still had several more months of service to complete before fulfilling Milwaukee's sixteen-month probationary period. Doing so proved elusive for Ramskugler. Months later, she had still failed to obtain a new medical clearance for unrestricted duty. As a result, on June 11, 2009, Police Chief Flynn notified the Board that he had terminated Ramskugler for being unable to proceed with required training.

Subsequently, Ramskugler, along with the Milwaukee Police Association ("MPA"), filed suit in the Milwaukee County Circuit Court. Together, they argued that Ramskugler was deprived of property without due process. Specifically, when firing Ramskugler, the Board did not follow the provisions of Wis. Stat. § 62.50(11)-(18), which set out mandatory procedures for terminating police officers. These provisions require, for example, discharge only "for cause and after trial," Wis. Stat. § 62.50(11), and continued pay while a charge against an officer is pending, Wis. Stat. § 62.50(18).[1] Importantly,

---

[1] When Ramskugler was discharged, § 62.50(18) guaranteed continued pay and benefits to discharged officers pending a

(continued...)

these protections apply only to a "member of the police force" or a "member of the force"—the two terms used consistently throughout the provisions. *See* Wis. Stat. § 62.50(11)-(18). The statute, however, does not define "member of the force," nor does it distinguish probationary officers when using the term. In the absence of further guidance, Ramskugler argued that the protections should apply to anyone who has completed the state training requirements and has been certified by the LESB.

The Board disagreed. It countered that Wis. Stat. § 62.50(3)(b) gives it the authority to set rules governing appointment of officers; therefore, an appointee does not become a "member of the force" until completing the city's extended probation. Since Ramskugler had completed only the state, but not the city, requirements, the Board could end her employment without following the statutorily prescribed procedures. *See* Board Rule XI, Section 7(a). According to Ramskugler, this reading of the statute is too broad; the state legislature did not give local boards the authority to extend probationary periods beyond the time mandated by the LESB.

---

[1] (...continued)

due process review hearing. *See Milwaukee Police Ass'n, Local 21 v. City of Milwaukee*, 757 N.W.2d 76, 79 (Wis. Ct. App. 2008) (quoting previous version of the statute). The statute was later amended and now applies only to suspended officers. *See* Wis. Stat. § 62.50(18).

The co-defendants—the Board, Edward Flynn (the Police Chief), and the City—removed the case to the United States District Court for the Eastern District of Wisconsin. On May 23, 2011, that court issued an order granting the defendants' motion for summary judgment. For unknown reasons, the district court did not address the claims with respect to the MPA in that ruling. On June 8, Ramskugler and the MPA timely filed a notice of appeal. They challenged the grant of summary judgment and requested that we certify two questions to the Wisconsin Supreme Court: (1) whether the protections afforded by Wis. Stat. § 62.50 apply to someone in Ramskugler's position; and (2) whether the Board has the authority to create probation requirements that exceed those set by the LESB.

On July 15, while this appeal was pending, Ramskugler signed a Settlement Agreement and General Release. This Agreement released all claims against the defendants and waived any right to a hearing or other process that Ramskugler may have had. The Agreement also provided Ramskugler with $150,000 "for alleged compensatory damages, for alleged personal physical injuries, and for disputed workers' compensation claims and attorneys fees." (Dkt. 11-2 at ¶ 3.) The Agreement, however, allowed for this appeal to continue "as a declaratory judgment action *only*." (*Id.* at preamble.) On July 21, the MPA signed a separate Agreement that pledged not to seek damages or attorney's fees if it succeeded in this appeal. (Dkt. 11-3 at ¶ 1.) Again, the Agreement allowed this suit to proceed solely as a declaratory judgment. (*Id.*

at preamble.) The MPA has not identified any other union member in Ramskugler's position.[2]

## II. ANALYSIS

To begin, we note that we need only address the claims as they relate to the MPA. At oral argument, Appellants' counsel acknowledged that, at most, only the MPA could now bring suit. We agree. Under the Settlement Agreement, Ramskugler no longer has a personal stake in the outcome of this case. She has received monetary compensation, waived any right to a hearing she may have had, and has released all other potential claims. There is no further relief this court can grant. Accordingly, Ramskugler no longer satisfies the requirements of federal jurisdiction. *See Camreta v. Greene*, 131 S. Ct. 2020, 2028 (2011) ("parties must have the necessary stake not only at the outset of litigation, but throughout its course"); *see also Ameritech Corp. v. Int'l Bhd. of Elec. Workers, Local 21*, 543 F.3d 414, 419 (7th Cir. 2008) ("settlements on appeal

---

[2] Another probationary officer, Justin Solsvig, had also joined the Amended Complaint. Solsvig stopped participating in the suit midway through litigation; he neither joined Ramskugler's motion for summary judgment nor responded to the Board's reciprocal motion, which listed him as a party. As a result, the district court granted summary judgment against Solsvig in a footnote, and he did not file a Notice of Appeal. We specifically asked the MPA at oral argument whether another union member on the record was or had been in Ramskugler's position. Counsel said no.

generally result in the dismissal of an appeal"). The MPA, however, still seeks reversal of the summary judgment and certification of the two aforementioned questions to the Wisconsin Supreme Court. Appellees contend that the MPA no longer has standing to bring this claim and that, alternatively, its claims are also moot. We address each argument in turn.

*A. Standing*

Article III, § 2 of the Constitution limits the jurisdiction of federal courts to "Cases" or "Controversies." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997). As such, federal courts are prohibited from rendering advisory opinions; they cannot divine on "abstract dispute[s] about the law." *Alvarez v. Smith*, 130 S. Ct. 576, 580 (2009). This restriction is implemented in the principles of justiciability, including standing. *Flast v. Cohen*, 392 U.S. 83, 95 (1968). Some components of standing derive directly from Article III and are thus mandatory, whereas other components are prudential and discretionary. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004). The requirements imposed by the Constitution are three-fold: a litigant must show (1) that she has "suffered a concrete and particularized injury that is either actual or imminent"; (2) "that the injury is fairly traceable to the defendant"; and (3) "that it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). When an organization seeks to assert standing, it can do so either

on behalf of itself or on behalf its members. The latter is called associational standing. Here, the MPA claims it has standing under both approaches.

### 1. Standing on Behalf of the MPA Itself

To bring suit in its own right, an organization must itself satisfy the requirements of standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *see also Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 800 (7th Cir. 2008). Here, the MPA fails to do so. It does not assert any injury to itself as an entity. Rather, the MPA only alleges injuries to its members, and such injuries are insufficient to establish standing on an organization's own behalf. Illustrating this distinction well, *Crawford v. Marion County Election Board* warrants consideration. 472 F.3d 949 (7th Cir. 2007) (*Crawford I*), *aff'd*, 553 U.S. 181 (2008) (*Crawford II*). In *Crawford I*, this court found that the Democratic Party had standing in its own right to challenge the constitutionality of a new Indiana law requiring voters to present a photo ID. 472 F.3d at 951. Specifically, because the Party alleged that it would be forced "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote," the organization itself had the requisite injury-in-fact. *Id.*[3]

---

[3] Although the Supreme Court agreed on little else when reviewing this court's opinion, a majority of the Justices ex-

(continued...)

Here, in contrast, the MPA has not pled any injury to itself. In the Amended Complaint, the entire discussion of the MPA's interest was to claim that, "as a result of having a duty to represent and advise its members on matters related to [this litigation], the MPA possesses a tangible interest in knowing the law as it may impact its members, as well as ensuring that its members are afforded due process." (Am. Compl. at ¶ 3.) This pleading leaves little doubt that the MPA's claim to standing derives entirely from its members. There is no mention of any injury to the MPA as an organization, such as having to expend greater resources to defend members who were wrongfully terminated. Such failure to allege injury in a complaint is fatal to standing, notwithstanding new arguments made on appeal. *See Disability Rights Wis.*, 522 F.3d at 801.

Yet, relying on *North Shore Gas Co. v. EPA*, the MPA argues that the "probabilistic benefit" described in its Amended Complaint is sufficient to confer standing. 930 F.2d 1239, 1242 (7th Cir. 1991). That theory misconstrues our precedent. In *North Shore*, the namesake company sought to enjoin construction of a boat slip that would have made an environmental clean-up operation more costly. *Id.* at 1241. Because the EPA had identified North Shore as a party potentially responsible for pollu-

---

[3] (...continued)
plicitly approved of how we handled the standing issue. *Crawford II*, 553 U.S. at 189 n.7 (Stevens, J., lead opinion); *id.* at 209 n.2 (Souter, J., dissenting).

tion to the site in question (and thus responsible for the clean-up), North Shore could have been saddled with that additional expense. *Id.* Ironically, the EPA was compelling another company to construct the boat slip that would have made the clean-up more expensive. *Id.* In seeking an injunction, North Shore claimed that the EPA failed to file the requisite environmental impact statement and to obtain the necessary permit. *Id.* at 1241-42. The EPA responded by challenging North Shore's standing. *Id.* at 1242. We held that "North Shore has standing in the Article III sense—it would derive a benefit if it won the suit, mainly because the construction of the new slip may increase the cost of cleaning up the . . . site and North Shore may be socked with that cost." *Id.*

The result in *North Shore* is distinguishable from this case. North Shore had standing not simply because it stood to benefit from the outcome of the case but because it also stood to lose money if the slip was constructed. Such economic harm is the prototypical injury-in-fact. In other words, *North Shore* does not abrogate the injury-in-fact requirement; it merely restates it. In light of the above, the MPA has not presented this court with a cognizable injury to itself. The MPA pled only that it stood to benefit from knowing how the law limits the Board's powers. This mere desire for information is not cognizable without a corresponding injury-in-fact, which the MPA has not pled. Therefore, the organization does not satisfy the first requirement for standing and cannot bring suit on its own behalf. Addressing the

MPA's own claims would produce an advisory opinion—a task we cannot undertake.

In so holding, we do not imply that federal courts can never hear cases regarding prospective injuries. To the contrary, prospective injury, such as the threat of enforcement, can indeed present a cognizable injury-in-fact. *See, e.g.*, *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 473-74 (7th Cir. 2012). We need not discuss such principles here, however, since the MPA has pled no injury at all, no less a prospective one.

*2.  Associational Standing*

The MPA's chances do not end there. Organizations can also bring suit through associational standing—that is, standing on behalf of their members. *United Food & Commer. Workers Union, Local 571 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996). An organization has associational standing if "'([1]) its members would otherwise have standing to sue in their own right; ([2]) the interests it seeks to protect are germane to the organization's purpose; and ([3]) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* at 553 (*quoting Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). The first two of these requirements derive from Article III, while the third is prudential. *See id.* at 555-57.

At this point, it is critical to distinguish between mootness and standing. Standing is evaluated at the time suit is filed. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw*

*Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) ("we have an obligation to assure ourselves that [Friends of the Earth] had Article III standing at the outset of the litigation"); *Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 743 n.2 (7th Cir. 2009) ("a plaintiff must establish standing at the time suit is filed and cannot manufacture standing afterwards"); *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999) ("[t]he requirements of standing must be satisfied from the outset"). In contrast, "[w]hen a party with standing at the inception of the litigation loses it due to intervening events, the inquiry is really one of mootness." *Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 516 (7th Cir. 2010).

The latter is the case here. Assuming the MPA had standing when litigation began, its standing must have derived from a member, because (as we have already held) the MPA could not have brought suit on its own behalf. Furthermore, only Ramskugler can continue to serve as the member satisfying the first requirement of associational standing. Two officers (including Ramskugler) were listed in the Amended Complaint, but the other stopped participating in the suit midway through litigation and no longer has an active claim. In addition, the MPA's counsel said at oral argument that the union has no other member in Ramskugler's position. Thus, with only Ramskugler left, whether this appeal can proceed depends upon whether her Settlement Agreement shattered the MPA's standing. Because Ramskugler signed that Agreement over a month after filing this appeal, the question is one of mootness, not standing.

This distinction highlights the difference between the two ways in which the MPA sought to sue. The claims allegedly brought on the MPA's own behalf are appropriately settled under the doctrine of standing. The MPA could not have filed those claims in the first instance, regardless of Ramskugler's settlement, because the MPA never pled any injury-in-fact to itself. In contrast, the claims brought on behalf of members are more appropriately decided as a question of mootness because the MPA likely had associational standing at the time the complaint was filed. We addressed the requirements of associational standing here, however, because they bear heavily on the mootness analysis that follows.

*B. Mootness*

When considering the mootness of this case, we must address two separate inquiries. First, we consider general mootness doctrine. Then, we address the exception for parties who continue to seek declaratory relief from an ongoing policy, even after the specific event precipitating the challenge has become moot. The MPA's case presents that situation. We established earlier that we can no longer grant relief to Ramskugler. But, according to the MPA, there is an ongoing policy at issue: the Board's claimed authority to terminate an LESB-certified officer without providing statutory process, so long as the officer is still in the city's extended probationary period. *See* Board Rule XI, Section 7(a). As we will discuss later, there is some tension between applying general mootness doctrine and allowing policy

challenges to proceed. Yet, we need not resolve any potential discrepancy today. Here, both approaches lead to the same result: the MPA's claims brought on behalf of its members are now moot.

### 1. General Mootness Doctrine

As alluded to earlier, mootness is "the doctrine of standing set in a time frame"; that is, "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth*, 528 U.S. at 189; *Arizonans for Official English*, 520 U.S. at 68 n.22; *Parvati Corp.*, 630 F.3d at 516. Thus, mootness doctrine requires re-evaluating the standing requirements throughout litigation. If at any point the plaintiff would not have standing to bring suit at that time, the case has become moot.

Yet, after using this "time frame" notion to describe mootness for decades, the Supreme Court has recently recognized that the approach is "not comprehensive." *Friends of the Earth*, 528 U.S. at 190. Specifically, the Court said that the "time frame" conception does not account for some well-established exceptions to mootness—a defendant's voluntary cessation of conduct and situations "capable of repetition, yet evading review." *Id.* If the mootness inquiry ended at re-evaluating standing, then cases falling within these exceptions would fail, even though settled mootness doctrine allows them to proceed. Notwithstanding these atypical cases, we have continued to use the "time frame" con-

ception as a generally accurate description of the relationship between standing and mootness. *See, e.g., Parvati Corp.*, 630 F.3d at 516; *Laskowski v. Spellings*, 546 F.3d 822, 824 (7th Cir. 2008). Our sister circuits have done the same. *See, e.g., La. Envtl. Action Network v. City of Baton Rouge*, 677 F.3d 737, 744 (5th Cir. 2012); *Lebron v. Rumsfeld*, 670 F.3d 540, 561-62 (4th Cir. 2012); *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 226 (3d Cir. 2011); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 556 (9th Cir. 2010); *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1189 n.16 (11th Cir. 2007); *Ramirez v. Sanchez Ramos*, 438 F.3d 92, 97 (1st Cir. 2006).

Applying the "time frame" approach to this case, we find that any claims the MPA may have originally had on behalf of its members are now moot. Because the inquiry centers on whether the requirements for standing "continue throughout [the] existence" of the litigation, *Friends of the Earth*, 528 U.S. at 189, we return to the prerequisites of associational standing. Here, the controversy surrounds the first requirement: whether any "members would otherwise have standing to sue in their own right." *United Food & Commer. Workers Union*, 517 U.S. at 553. Ramskugler no longer fulfills that role for the MPA. If she were to file suit today, she would lack standing because she does not have a redressable claim—her Settlement Agreement waived any sort of relief this court could grant her. Without establishing standing in her own right, Ramskugler cannot be used by the MPA to satisfy the first requirement of associational standing.

Furthermore, the MPA does not have any other members who could fulfill that requirement. Neither in its briefs, nor at oral argument, did the MPA reference any other person in Ramskugler's very specific liminal state: an individual, who was certified by the LESB, but not yet through the Board's extended probationary period, and was thus terminated without the protections accorded by Wisconsin statute. Without another member in that particularized position, the MPA cannot assert associational standing. Therefore, if mootness were merely a question of standing in a time frame, then the MPA's claims would be unquestionably moot.

### 2. *Mootness in Challenges to Ongoing Policies*

Our mootness inquiry, however, is not complete. Some cases hold that disputes over an ongoing policy may continue, even after the specific offense precipitating the suit has become moot. *See, e.g.*, *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 121-24 (1974); *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009); *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1118 (9th Cir. 2003). In those cases, if a litigant challenges the policy through a declaratory judgment, then the case should proceed when "'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Super Tire Eng'g Co.*, 416 U.S. at 122 (*quoting Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). In addition, the ongoing

policy must be a "continuing and brooding presence" that "casts . . . a substantial adverse effect on the interests of the petitioning parties." *Id.*

The foundational Supreme Court case establishing this mootness exception is *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115. In that case, New Jersey state regulations provided welfare benefits to striking workers. *Id.* at 116. A company sought two forms of relief: an injunction to prevent the State from using funds for those benefits and a declaratory judgment to find that several federal laws preempted the state regulations. *Id.* at 118-19. Before the district court could rule, the strike at issue ended. *Id.* at 120. Although the district court still reached the merits, the Third Circuit remanded with instructions to dismiss the case as moot. *Id.* at 120-21. The Supreme Court, however, found that the claim for declaratory relief still presented a live controversy. *Id.* at 122. Even though intervening events had settled the act precipitating the suit, the case was not moot because "the challenged governmental activity . . . has not evaporated or disappeared, and, by its continuing and brooding presence, casts . . . a substantial adverse effect on the interests of the petitioning parties." *Id.* The Court also found that the case fit within the "capable of repetition, yet evading review" exception, but that was merely an alternative holding. *Id.* at 125-26.

Subsequent cases support finding a separate exception for mootness when a suit challenges a policy with the kind of lasting effects discussed in *Super Tire Engineering Co. See, e.g., Reno v. Bossier Parish Sch. Bd.*, 528

U.S. 320, 327-28 (2000) (declaratory judgment on the propriety of electoral redistricting is not moot, even when the next election will not occur until after data from the next census becomes available, because the previous redistricting, if valid, will form the baseline upon which to judge future redistricting), *superseded on other grounds by statute*, 42 U.S.C. § 1973c(c); *Del Monte Fresh Produce Co.*, 570 F.3d at 321 ("a plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy"); *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 129-30 (2d Cir. 2008) (Sotomayor, J.) (challenge to an order to report certain billboard expenses as lobbying activity is not moot, even when the dispute about the particular billboard has ended, because there was a challenge to an alleged ongoing policy); *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 165 n.6 (3d Cir. 2008) (challenge by school board to the district court's finding that a regulation was facially unconstitutional is not moot, even when the contract of the faculty member challenging the regulation expired, because the school board cannot enforce the regulation as to any other faculty members); *Harris v. City of Houston*, 151 F.3d 186, 191 n.5 (5th Cir. 1998) ("[r]equests for declaratory relief may sustain a suit only when the claims challenge some ongoing underlying policy rather than merely attacking an isolated action") (internal quotation marks, brackets, and ellipses omitted); *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994) ("[i]t is well-established that if a plaintiff challenges both a specific agency action and the *policy* that underlies that action, the challenge to the policy is not necessarily

mooted merely because the challenge to the particular agency action is moot").

There is tension, however, between applying the "time frame" approach to mootness and preserving challenges to ongoing policies. Typically, when a concrete dispute ends, the individual involved would no longer have the ability to bring suit (and would thus lack "standing in a time frame"). Yet, cases like those discussed above have proceeded, and the Supreme Court did not explicitly mention this exception as one overlooked by the time frame conception. *Friends of the Earth*, 528 U.S. at 190-91. For that reason, it is tempting to lump these cases into the "capable of repetition, yet evading review" exception. Doing so would smooth out any incongruity, as the Supreme Court did acknowledge the incompleteness of the "time frame" approach when that exception applies. *Id.* at 190. In fact, the "capable of repetition, yet evading review" exception could be an alternative holding for some cases in which challenges to ongoing policies are not moot. *See Super Tire Eng'g Co.*, 416 U.S. at 125-26.

In other situations, however, using the "capable of repetition, yet evading review" exception is more like fitting a stepsister's oversized foot into Cinderella's dainty glass slipper. This narrow exception "applies only where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *United States v. Juvenile Male*, 131 S. Ct.

2860, 2865 (2011) (*per curiam*) (internal quotation marks and brackets omitted). The Ninth Circuit, in particular, has shoehorned ongoing policy challenges into that exception. Its case law creates a new variant of the "capable of repetition, yet evading review" exception for such disputes, even when the parties would not otherwise qualify for the exception as articulated doctrinally. *See L.A. Unified Sch. Dist. v. Garcia*, 669 F.3d 956, 958 n.1 (9th Cir. 2012). Still, the Ninth Circuit has only applied this expanded exception when a civil class action would be inappropriate—namely, cases involving treatment of criminal defendants or prisoners. *See Alvarez v. Hill*, 667 F.3d 1061, 1065 (9th Cir. 2012); *see also L.A. Unified Sch. Dist.*, 669 F.3d at 958 n.1; *United States v. Brandau*, 578 F.3d 1064, 1067-68 (9th Cir. 2009); *United States v. Howard*, 480 F.3d 1005, 1010-11 (9th Cir. 2007); *Or. Advocacy Ctr.*, 322 F.3d at 1117-18. Considering that the parties here have neither asked us to adopt nor to broaden the Ninth Circuit's already expanded approach (both of which would be required to apply it to this case), we need not address that question. Furthermore, without adopting the Ninth Circuit's reading of the exception, this case plainly does not fall within the standard "capable of repetition, yet evading review" doctrine. There is no indication that the due process challenge of a probationary officer is too ephemeral to be sustained over the course of litigation. Rather, this concrete dispute ended only because Ramskugler voluntarily settled with the Board.

Without the escape hatch of the "capable of repetition, yet evading review" exception, we return to the tension

between the "time frame" approach and the exception
for challenges to policies with a "continuing and
brooding presence," *Super Tire Engineering Co.*, 416 U.S.
at 122. It seems likely, given that the Supreme Court
has already acknowledged the incompleteness of the
"time frame" approach, that these ongoing policy cases
simply represent another way in which the approach
does not account for an exception to mootness doctrine.
Alternatively, one could view the "brooding presence"
of a policy as an ongoing injury within the "time frame"
of litigation. Only a few cases, however, clearly adopt
that analysis, and, given the difficulty of cabining such
a concept, we are reluctant to resolve the matter in
that way without explicit briefing on the issue. A still
third interpretation: perhaps federal courts are only
prohibited from deciding cases when the *issue* is moot
but have prudential discretion when merely the
personal stake is moot. *See* Matthew I. Hall, *The Partially
Prudential Doctrine of Mootness*, 77 Geo. Wash. L. Rev.
562, 599 (2009).

Regardless, we do not need to answer definitively
how the *Super Tire Engineering Co.* exception fits into the
broader scheme of mootness doctrine. That question is
for another day. Rather, applying the explicit language
of *Super Tire Engineering Co.* resolves the issue here. To
qualify for that mootness exception, the ongoing policy
must "by its continuing and brooding presence, cast[ ] . . .
a substantial adverse effect on the interests of the peti-
tioning parties*." Super Tire Engineering Co.*, 416 U.S. at
122. Nothing of that sort exists here. As discussed, the
MPA has not proffered any other member who is faced

with Ramskugler's predicament. Further still, the MPA has not referenced someone who was in that position previously, which implies that Ramskugler was merely trapped in a sparsely populated limbo. The MPA has not even pled a single injury-in-fact. As such, the MPA has given us no reason to find the continuing policy a "brooding presence" over it, much less one with a "substantial adverse effect." *Id.* This case is now "an abstract dispute about the law" not linked to the rights of a particular plaintiff. *Alvarez v. Smith, supra*, 130 S. Ct. at 580. Federal courts cannot produce advisory opinions on such issues. It does not matter that the parties agreed to allow this suit to proceed as a declaratory judgment. They do not get to make that decision. Parties cannot contract around the limitations of federal court jurisdiction. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 850-51 (1986).

### 3. *The Relationship Between Ripeness and Mootness*

Before concluding, a note on ripeness is warranted. When some of our sister circuits have considered challenges to policies that raise mootness concerns, they have addressed the cases under the doctrine of ripeness. *See, e.g., Grandeau*, 528 F.3d at 130-34 (analyzing a challenge to an alleged policy using ripeness doctrine because it was unclear to what extent the policy was officially adopted and to what extent the policy would be enforced in the future); *Reg'l Mgmt. Corp. v. Legal Servs. Corp.*, 186 F.3d 457, 465-66 (4th Cir. 1999) (analyzing

a challenge to an ongoing policy against disclosing certain documents under FOIA using ripeness doctrine, when eventual receipt of the documents made the initial offense precipitating the challenge moot). Because this case was framed on appeal as a question of mootness, and that question was outcome determinative, we thought it the appropriate ground on which to rule. That said, we acknowledge that ripeness would have been a cleaner means by which to reach the same outcome.

Like mootness, but unlike standing, ripeness is re-evaluated throughout the course of litigation. *See Anderson v. Green*, 513 U.S. 557, 559 (1995) (*per curiam*) (when evaluating ripeness, "'it is the situation now rather than the situation at the time of the decision under review that must govern'") (internal brackets omitted) (*quoting Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 140 (1974)). An inquiry into ripeness involves considering "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011) (*quoting Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983)). Here, the second factor is dispositive. As discussed earlier, the lack of injury pled by the MPA shows that it will face no hardship by withholding consideration. In fact, at oral argument, the MPA admitted that it saw no obstacle to waiting until the situation happens again to bring suit. We think that is the correct thing to do.

**III. Conclusion**

For the foregoing reasons, we Dismiss this appeal.