In the

United States Court of Appeals

For the Seventh Circuit

_____

No. 14-3755

DND INTERNATIONAL, INC.,

*Petitioner*,

*v.*

FEDERAL MOTOR CARRIER SAFETY ADMINISTRATION,

*Respondent*.

_____

Petition for review from the
Federal Motor Carrier Safety Administration.
No. FMCSA-2014-0159 — **John Van Steenburg**,
*Assistant Administrator*.

_____

ARGUED SEPTEMBER 24, 2015 — DECIDED DECEMBER 15, 2016

_____

Before MANION, ROVNER, and HAMILTON, *Circuit Judges*.

MANION, *Circuit Judge*. DND International is a trucking company whose operations were frozen in April 2014 when the Federal Motor Carrier Safety Administration (FMCSA) declared DND an imminent hazard and gave it only a few hours to pull its trucks off the road. This case started with a tragic accident on an unlit road on the night of January 27, 2014, when driver Renato Velasquez of DND International

crashed his semi-truck into two emergency vehicles and another semi which were stopped on an Illinois highway. An Illinois Toll Authority employee was killed and a police officer was seriously injured. As a result of this tragedy, the FMCSA immediately revoked Velasquez's commercial-driving privileges.

The FMCSA then opened a company-wide investigation into whether DND's drivers were following federal regulations designed to keep exhausted drivers off the roads. This investigation went on for approximately two months, and it appears to have been quite thorough. It entailed many interviews, examination of records, verification of statistics, and a number of interactions among FMCSA personnel. In fact, at the conclusion of the investigation, the Field Administrator of the Midwestern Service Center, Darin Jones, in consultation with the FMCSA Director of Enforcement, legal counsel, and FMCSA headquarters, spent one full week reviewing all relevant information to ensure all the results were accurate before he made his decision to issue an imminent-hazard out-of-service order, also known as an IHOOSO.

Significantly, all during the two-month investigation DND was permitted to continue normal operations. It was later determined that during the two-month period there were two or three minor problems, but otherwise the company operated fully and efficiently without incident. Nevertheless, on April 1, 2014, the FMCSA issued an IHOOSO without warning, directing DND to immediately halt its trucking operations nationwide. This was not an order telling the company it must conclude all deliveries and not dispatch new deliveries or pickups. Rather, trucks were ordered to immediately stop within eight hours, no matter where the trucks

were, and no matter what loads were in the process of being delivered.

DND petitioned for administrative review of the IHOOSO. In response, an administrative law judge (ALJ) opened a hearing nine days after the freeze order issued and rendered his decision after another six days. The ALJ ultimately found that the IHOOSO should not have been issued, and he revoked it, noting that the IHOOSO was an effective "death penalty" to this small company. As best we can tell from the record and from the oral argument, the company has ceased doing business during the pendency of this action. The sudden halt to the company's operations put the company out of business. As shown below, this petition for review does not focus on the irretrievable damage suffered by DND, but rather seeks to correct a decision of an assistant administrator that upheld the ALJ grant of relief to DND. As a result, the case is moot and this court lacks the jurisdiction to provide DND any relief. Thus, we dismiss the petition for review for want of Article III standing.

## I. Background

On January 27, 2014, DND driver Renato Velasquez was passing through DuPage County, Illinois on Interstate 88 when he crashed into a semi-truck and two emergency vehicles with their lights flashing. In the resulting compliance review, the FMCSA found that Velasquez was driving more hours than federal regulations allow. The review also disclosed that during the week before the accident, Velasquez falsified his duty-status log four times. He was declared an imminent hazard to the public on February 10, 2014, and ordered to immediately stop commercial driving.

Although DND's other drivers were allowed to continue operating, the FMCSA's compliance review was not limited to Velasquez. The agency found that some other DND drivers had similar violations from driving more hours than allowed or falsifying duty-status logs. Duty-status logs should reflect where drivers are located at a given time. These are strict-liability regulatory violations. False records can thus reflect intentional wrongdoing; they can also result inadvertently when a driver is relying on his imperfect memory to report when and where he drove. The FMCSA examines these records because, by tracking driving hours and locations, the government intends to keep exhausted truckers off the road.

The FMCSA's company-wide compliance review showed several regulatory violations among DND drivers as a group. Three times, DND drivers drove more hours than allowed. And three times, duty-status logs were inaccurate. The FMCSA did not find these violations merited the "critical" safety rating, which would have required DND to halt operations.

Instead, as a result of its compliance review, the FMCSA issued the "conditional" safety rating to DND on March 21. This particular type of safety rating allowed DND to continue its trucking operations. This rating also issued 54 days after the Interstate 88 accident that triggered the FMCSA's compliance investigation. On March 21, the agency met with DND, which initiated changes. On March 28, DND sent the agency an email stating that it was installing electronic on-board recorders (EOBRs) in every single one of its commercial vehicles. EOBRs are integrated into truck engines and automatically generate duty-status records, which means that DND drivers have no way to falsify reports on how many hours

they are driving, when, and where. EOBRs are also a technology that the FMCSA recommends to reduce fatigued driving.

Thus, by all accounts, the safety risk that DND posed was, by the end of March, substantially resolved by cooperation between DND and the FMCSA. The offending driver had been removed. DND was under investigation, and it was initiating additional safety protocols. Further, the company had operated for three months without incident.

Yet on April 1, the FMCSA suddenly issued an imminent-hazard order against DND. DND had, in the view of the FMCSA, been operating *for three months* since the incident as an *imminent* hazard. The FMCSA had expressly determined that DND did not have "adequate" safety management controls in place, and allowed the company to operate. Then, on April 1, it reiterated this same conclusion, and issued the order.

This order was served at 2:38 PM on April 1. DND was allowed exactly eight hours to halt operations and report the location of every DND truck to an FMCSA administrator. DND had 30 to 35 trucks on the road that day. In the words of the ALJ, this order amounted to a "death penalty" for DND, a small operation that still has not recovered. In addition to citing the log-falsification violations, this IHOOSO stated that DND had a record of unsafe driving in the six months preceding the order. While DND drivers had some problems, this was their record: one seatbelt violation, one lane-change ticket, and two speeding tickets over 2.7 million miles driven by many drivers. To say the least, these violations were rare.

Further, the FMCSA field administrator claims that he had already decided to issue the imminent-hazard order over a

week before April 1st, and he used this week to confer with his enforcement director, legal counsel, and headquarters. After parking its trucks as ordered, DND contacted legal counsel and on April 4 petitioned for review of the imminent-hazard order. The ALJ determined that agency review was statutorily required within 10 days. She ruled that the triggering date was April 4, when DND served its petition, so she ordered that a hearing and decision both happen by April 14. On April 8, DND told the ALJ that it would not waive the "ten-day statutory requirement that [it receive] a decision within the ten days." The ALJ set a hearing to begin on April 10 and end on April 14, with an ALJ ruling on the IHOOSO scheduled to issue on April 14.

DND's case was then reassigned to a separate ALJ, who opened an administrative hearing on April 10. It continued on April 11, 14, and 15, with a weekend break. Due to administrative facility-use limits, the hearing ended at 5 PM each day, and there was no option to continue over the weekend. On April 14, the ALJ asked DND to grant a one-day waiver of the April 14 deadline, and the company agreed. On April 15, DND asked the ALJ for a decision that day, but the judge was not ready to rule.

The next day, April 16, the ALJ issued a 66-page decision, which found in DND's favor on both the procedural and substantive issues. First, regarding procedural rights, the FMCSA argued that review of the imminent-hazard order must only start within 10 days. On this issue, the ALJ wrote that the law requiring an ALJ decision on an FMCSA freeze order "has been settled since … 1997. We are bound by the case law of the Department." According to his decision, long-standing DOT precedent required a decision on the freeze order within

10 days. Second, the ALJ also ruled for DND on its substantive rights, by rescinding the imminent-hazard order as improperly issued. Among his other findings, the ALJ concluded that the FMCSA field administrator's "testimony contradicted most of the allegations" in the IHOOSO he issued.

As it had won all the relief it requested, DND had neither method nor motive to appeal this ALJ order. The FMCSA did appeal, however, to its Assistant Administrator. As he wrote in his final decision, the FMCSA appealed these distinct issues: (1) the ALJ's finding "that the imminent hazard statute, due process, and the Administrative Procedure Act (APA) required the Agency to complete a formal administrative review no longer than 10 days after issuance of an imminent hazard order," and (2) the ALJ's decision to rescind the freeze order. The FMCSA sought different relief on each issue: it wanted a removal of the 10-day deadline requirement for IHOOSO review and requested reinstatement of the IHOOSO issued against DND.

Six months after the ALJ's order, the Assistant Administrator overturned the ALJ ruling on the 10-day deadline, while upholding the decision to rescind the IHOOSO. Based on the Assistant Administrator's readings of Section 521 and the Fifth Amendment, he concluded that DND was only entitled to a post-deprivation hearing which began within 10 days of its request for review. Yet, he concluded, the IHOOSO was improper on the merits, because the Field Administrator failed to prove that DND's operation constituted an imminent hazard.

In practice, none of this affected the substantive rights of DND, which had already received all the relief to which it was entitled on April 16. At this point, the dispute and ruling of

the Assistant Administrator might be best characterized as in-
tra-agency decision-making. Yet, it is this decision which is
before the court, on a petition for review pursuant to 49 U.S.C.
§ 521(b)(9), which authorizes this court to review final orders
on a substantial evidence standard. Today we dismiss this
case for lack of standing.

## II. Discussion

The parties extensively disputed whether or not the
FMCSA had a statutory obligation to *start* or also to *decide*
whether an IHOOSO was properly issued within ten days.
This is a serious issue which certainly affects the ability of
companies to freely operate. And, in this case, there is no
doubt that delay on the part of the agency appears unjustified
and particularly damaging. Nevertheless, we must always en-
sure that we have jurisdiction over any case.

Article III of the Constitution limits the jurisdiction of the
federal courts to deciding "cases" and "controversies," and
the requirement of an actual controversy must exist not
merely at the initiation of the action, but throughout all stages
of the litigation. *Kingdomware Techs., Inc. v. United States*, ___
U.S. ___, 136 S. Ct. 1969, 1975 (2016); *Chafin v. Chafin*, ___ U.S.
___, 133 S. Ct. 1017,1023 (2013); *Milwaukee Police Ass'n v. Bd. of
Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 929
(7th Cir. 2013). In order to meet that requirement, "a litigant
must show (1) that she has 'suffered a concrete and particu-
larized injury that is either actual or imminent'; (2) 'that the
injury is fairly traceable to the defendant'; and (3) 'that it is
likely that a favorable decision will redress that injury.'" *Mil-
waukee Police Ass'n*, 708 F.3d at 926 (quoting *Massachusetts v.
EPA*, 549 U.S. 497, 517 (2007)). "Plaintiffs must demonstrate a

'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983), quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962).

Because DND already received all of the relief it sought—the rescission of the imminent hazard order and the notice of revocation—DND is not subject to any ongoing injury that this court is equipped to remedy. In fact, in its request for relief in this petition for review, DND does not even seek any relief related to itself. First, DND "asks that this Court hold that 49 U.S.C. § 521(b)(5)(A) requires that, within 10 days of the issuance of an IHOOSO, an ALJ issue an Initial Decision, after a review conducted pursuant to § 554 of the Administrative Procedures Act."

That request is merely for an advisory opinion that would only affect future regulated entities. Perhaps because it is no longer operating, DND has never sought declaratory relief in this matter; its argument for what must occur within 10 days was one of the two grounds on which it sought to have the imminent hazard order rescinded, not the basis for any additional form of relief. *Milwaukee Police Ass'n*, 708 F.3d at 926 ("federal courts are prohibited from rendering advisory opinions; they cannot divine on 'abstract dispute[s] about the law.'") (quoting *Alvarez v. Smith*, 558 U.S. 87, 93 (2009)).

And, to the extent the Assistant Administrator erred in his analysis, that hypothetical error did not affect the substantive rights of DND on appeal from the decision of the ALJ. The appeal from the ALJ to the Assistant Administrator is best characterized as internal agency process, a system by which the agency itself works out its own, internal view about the

contours of the law. Indeed, there seems no real reason that DND needed to have been privy to the decision of the Assistant Administrator at all.

Once the IHOOSO was lifted, there was no longer any ongoing injury redressable by this court. Certainly, in "exceptional," limited circumstances we recognize an exception to mootness doctrine where injuries are "capable of repetition, yet evading review." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998). In this case, however, the limited exception is inapplicable. If DND's complaint is that at the time of the action, an IHOOSO is in effect and the agency is dragging its heels in violation of the statutory deadline, DND can sue to compel a decision by the agency. If the complaint is that DND reasonably anticipates the agency to do something it contends violates the statutes, DND can sue for declaratory relief to clarify agency duties.[1] In other words, there is nothing here that evades review.

Another way of approaching the defect in this case is by asking what it is DND alleges that the agency did wrong. Since this is a petition for review of an agency decision. DND does not, and need not, allege that the missed deadline materially harmed it. Rather, in the action before us what DND in effect alleges is that the legal reasoning of the Assistant Administrator itself harms DND; that the FMCSA exceeded its

---

[1] If DND's complaint (something which appears quite plausible on the facts of this case) is that the agency was acting arbitrarily in its issuance of an IHOOSO, and that DND was damaged by this, DND has an available cause of action in the form of a *Bivens* claim. *Bivens v. Six Unknown Names Agents of Federal Bureau of Narotics*, 403 U.S. 388 (1971). This is certainly a high bar; if DND alleged financial damage in addition to the bare statutory violation, it might have had its day in court.

statutory deadline to issue a decision, and then issued a correct decision, but based upon faulty reasoning.

It is certainly true that in completing its IHOOSO review on April 16, the agency exceeded its ten-day statutory deadline by five days.[2] Pursuant to 49 U.S.C. § 521(b)(5)(A), DND was entitled to "opportunity for review … not later than 10 days after issuance of [an imminent-hazard] order." The corresponding regulation uses essentially identical language to require 10-day review. *See* 49 C.F.R. § 386.72(b)(4). Although the agency observed at oral argument that meeting a 10-day deadline can be difficult, the challenge of honoring deadlines that protect enjoined parties' rights is hardly unique to this situation. The agency could opt to continue hearings beyond its 5 PM closing time in urgent cases like this or otherwise adjust its practices to satisfy the statutory deadline. With this extraordinary power, even if complying with the statute is challenging for the agency, it is absolutely vital to ensure that the procedural mandates for IHOOSO review are honored. Reviewing a shut-down of an overland shipping company is not something an agency should slow-walk.

---

[2] The FMCSA urges that DND waived its 10-day deadline at least until April 15. The party affected by an imminent-hazard order can consent to extending the statutory timeline, as DND did here. DND agreed on April 14 to extend the deadline by one day, in response to the ALJ's prompting. But even that new deadline was missed. Further, DND was operating under the review structure established by the agency, and the agency chose to start the 10-day clock when DND petitioned, rather than starting the clock when it issued the IHOOSO. Thus, even if we apply a one-day extension, April 12 should have been the last date for the ALJ to complete his review.

To the extent DND complains that the IHOOSO could come at any time during an open investigation, it has a real concern that should not be minimized. Open investigations—placing companies or state governments into essentially agency receivership—can impose heavy costs on business. To the extent these open investigations are reasonable results of scarce resources, broad agency mandates, and managerial practices of the executive branch, they are unreviewable by the federal courts. But sometimes agency delay is not reasonable, and this is not to say that "arbitrary and capricious" agency action is unreviewable.[3]

It might be that the Assistant Administrator was wrong about the statutory requirements of 49 U.S.C. § 521(b)(5)(A). Perhaps the plaintiff's legal theory is correct. But when the Assistant Administrator construed that statute, DND was not affected by his decision either way. It was a party to that agency decision only on paper. Had the company remained in business and recovered from the regulatory burden, it would have been free to operate.

Accordingly, this case is dismissed for want of Article III standing.

---

[3] Again, to the extent DND claims that the company-wide IHOOSO was arbitrary or capricious, or some sort of unlawful targeting by the agency, DND might have an available *Bivens* cause of action.