In the
# United States Court of Appeals
### For the Seventh Circuit

No. 18-3644

PRAIRIE RIVERS NETWORK,

*Plaintiff-Appellant,*

*v.*

DYNEGY MIDWEST GENERATION, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:18-cv-02148 — **Colin S. Bruce**, *Judge.*

ARGUED NOVEMBER 13, 2020 — DECIDED JUNE 28, 2021

Before FLAUM, ROVNER, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Prairie Rivers Network is an Illinois non-profit organization that advocates for clean water and healthy rivers. Under the Clean Water Act's citizen-suit provision, PRN sued Dynegy Midwest Generation, LLC, alleging that Dynegy illegally discharged coal ash pollutants into groundwater, which in turn entered the Middle Fork of the Vermilion River. The district court held that the Clean Water Act did not cover these groundwater discharges, so it

dismissed PRN's suit for lack of jurisdiction. We then stayed PRN's appeal pending the Supreme Court's decision in *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020). In that case, the Court established a multi-factor test to determine whether groundwater discharges fall under the Clean Water Act's ambit. *Id.* at 1476–77.

We need not assess *County of Maui*'s reach, however, because PRN lacks standing. PRN has more than 1000 members yet fails to show that at least one of those individual members has standing. Associational standing, which PRN asserts, requires more specificity. Without at least one individual member who can sue in their own right, PRN cannot sue on their behalf. Because PRN cannot cure that defect via declarations on appeal, we affirm the district court's dismissal for lack of jurisdiction.

**I**

**A**

Located five miles north of Oakwood, Illinois, the Vermilion Power Station is a retired coal-fired power plant that operated from the mid-1950s until 2011. While in operation, the station burned coal and, as a result, generated coal ash. Dynegy, which currently owns the station, and its predecessors mixed this coal ash with water, depositing it into three unlined pits: the Old East Ash Pond, the North Ash Pond System, and the New East Ash Pond. Owned and maintained by Dynegy, these pits remain inactive but currently contain 3.33 million cubic yards of coal ash. The station and the coal ash pits sit close to the Middle Fork of the Vermilion River, a navigable water protected by the Clean Water Act.

Dynegy has a National Pollutant Discharge Elimination System permit to discharge wastewater from the station's operations into the Middle Fork. Under the Act, Congress delegated permit-issuing authority to the states through 33 U.S.C. § 1342(b). Dynegy's permit, granted by the Illinois Environmental Protection Agency, sets effluent limitations as well as monitoring and reporting conditions under Illinois state law.[1] It also allows for direct discharges into the Middle Fork through nine external outfalls from the station. These nine outfalls, however, are not at issue in this case.

Instead, PRN sued Dynegy over indirect discharges from the coal ash pits. According to PRN, Dynegy's permit does not authorize the coal ash seepage from the North Ash Pond and Old East Pond into the groundwater, which then enters the Middle Fork. These groundwater discharges, PRN contends, contain pollutants—"including, but not limited to, arsenic, barium, boron, chromium, iron, lead, manganese, molybdenum, nickel, sulfate, and total dissolved solids"—and have been occurring since at least May 2013.[2] Because its individual members "live near, study, work, and recreate in and around, the Middle Fork, including in the vicinity of the Vermilion Power Station," PRN maintains it has an interest in stopping and remedying these alleged discharges, which degrade not only the Middle Fork's water quality, but also its "aesthetic

---

[1] Under 33 U.S.C. § 1362(11), "[t]he term 'effluent limitation' means any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance."

[2] Plaintiff's Complaint, D.Ct. ECF No. 1, p. 11, ¶ 48.

beauty and ecological vitality."[3] By PRN's account, its individual members' "use and enjoyment of the Middle Fork," has been, and will continue to be, harmed by the groundwater seepage into the Middle Fork.[4]

**B**

In its citizen-suit under the Clean Water Act, PRN alleged Dynegy committed two violations of 33 U.S.C. § 1311(a), which prohibits "the discharge of any pollutant" except as otherwise permitted. For Count I, Dynegy's groundwater seepage from the coal ash pits allegedly constituted an unpermitted discharge of pollutants into the Middle Fork. For Count II, this same seepage also allegedly violated two state-law conditions of Dynegy's permit. Dynegy then moved to dismiss both counts under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Relying on *Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962 (7th Cir. 1994), Dynegy asserted that the Clean Water Act does not regulate groundwater discharges, even when that groundwater connects to surface waters regulated under the Act.

The district court agreed. Based on *Oconomowoc*, the district court dismissed PRN's suit under Rule 12(b)(1) for lack of subject-matter jurisdiction. This court held in *Oconomowoc* that the Clean Water Act did not govern discharges from "artificial ponds." 24 F.3d at 966. Although "[t]he possibility of a hydrological connection" between artificial ponds and ground waters "cannot be denied," this court concluded that "neither the statute nor the regulations makes [sic] such a

---

[3] *Id.* at p. 4, ¶ 13.

[4] *Id.*

possibility a sufficient ground of regulation" under the Clean Water Act. *Id.* Applying *Oconomowoc*, the district court dismissed Count I and held that the Clean Water Act did not govern the groundwater seepage from the coal ash into the Middle Fork. Because Count I and Count II contained identical factual allegations, the district court also dismissed Count II, holding that the Clean Water Act could not provide federal jurisdiction for Dynegy's alleged violations of state-law conditions within its permit.

PRN timely appealed. After the Supreme Court granted certiorari in *County of Maui*, we granted PRN's unopposed motion to stay appellate proceedings pending that decision. In *County of Maui*, the Court held that the Clean Water Act "require[s] a permit if the addition of the pollutants through groundwater is the functional equivalent of a direct discharge from the point source into navigable waters." 140 S. Ct. at 1468. PRN and Dynegy then filed position statements based on that decision, with PRN also moving for summary reversal. We denied PRN's motion and set a briefing schedule. When it filed its opening brief, PRN also moved for leave to file supplemental documents, attaching declarations from several of its individual members and staff to support standing. Dynegy opposed that motion, which we took with the case for resolution.

## II

Although Dynegy moved to dismiss PRN's suit under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, that motion concerned coverage under the Clean Water Act, not standing. On appeal, Dynegy challenges PRN's standing for the first time. A standing challenge under Rule 12(b)(1) typically "can take the form of a facial or a

factual attack on the plaintiff's allegations." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). A facial attack "tests whether the allegations, taken as true, support an inference that the elements of standing exist," and a factual attack "test[s] the existence of jurisdictional facts underlying the allegations." *Id.* We construe Dynegy's standing challenge on appeal as a facial attack, which "require[s] only that the court look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (emphasis omitted). We thus accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff, PRN. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). Our review is de novo. *Bazile*, 983 F.3d at 278.

**A**

Article III of the Constitution limits the federal judicial power to deciding "Cases" and "Controversies." As an essential part of a federal court's authority under Article III, standing doctrine ensures respect for these jurisdictional bounds, "confin[ing] the federal courts to a properly judicial role" and "limit[ing] the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). For standing under Article III, a plaintiff must have: (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision. *Id.* When a plaintiff lacks standing, a federal court lacks jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998).

Establishing standing is the plaintiff's burden and "must be secured at each stage of the litigation." *Bazile*, 983 F.3d at

278. This is because the elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). But "[a]s the litigation progresses, the way in which the plaintiff demonstrates standing changes." *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 285 (7th Cir. 2020). So "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (alteration in original) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). For facial standing challenges, as here, we employ the familiar "plausibility" requirement—the same standard used to evaluate challenges to claims under Rule 12(b)(6). *Silha*, 807 F.3d at 174.

Associational standing allows an organization to sue on behalf of its members "even without a showing of injury to the association itself." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996); *but cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (concluding that an organization had standing to sue in its own right based on institutional interests). To sue on behalf of its members, an association must show that: (1) at least one of its members would "have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Wash. State Apple Advert. Com'n*, 432

U.S. 333, 343 (1977); *see Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir.), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020). This three-part test for associational standing "guarantees the satisfaction" of Article III "by requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United Food*, 517 U.S. at 555. Associational standing, then, is derivative of—and not independent from—individual standing. *See id.* ("As *Hunt*'s most direct address to Article III standing, this first prong [of individual member standing] can only be seen as itself an Article III necessity for an association's representative suit.").

Two seminal environmental standing cases show the limits of associational standing. In *Summers v. Earth Island Institute*, the Supreme Court addressed, on an appeal from summary judgment, whether several environmental organizations had associational standing for an injunctive challenge to land management regulations promulgated under the Forest Service Decisionmaking and Appeals Reform Act, 16 U.S.C. § 1612 *et seq.* 555 U.S. 488, 490–92 (2009). The Court held that they did not, concluding that the affidavits offered by individual members were insufficient. *Id.* at 494–97 (noting that one affiant had mooted his interest in the case by settling, and another failed to tie his injury to the challenged regulations, identify a particular site, or allege a future injury that could be remedied by enjoinment). In rejecting the dissent's "statistical probability" approach to standing for the environmental organizations, the Court stated that this "novel approach to the law of organizational standing would make a mockery of our prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one

identified member had suffered or would suffer harm." *Id.* at 497, 498. "In part because of the difficulty of verifying the facts upon which such probabilistic standing depends," the Court explained, it "has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm." *Id.* at 499. And "when so many thousands are alleged to have been harmed," that is "surely not a difficult task." *Id.* As the Court concluded, "naming the affected members" is a requirement for associational standing that "has never been dispensed with in light of statistical probabilities." *Id.* at 498–99 (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958) as a counterexample).

*Lujan* is also instructive. In that case, the Court considered whether several environmental organizations had associational standing to challenge a rule concerning foreign wildlife funding promulgated under the Endangered Species Act of 1973, 16 U.S.C. § 1536 *et seq. Lujan*, 504 U.S. at 557–59. To show associational standing at summary judgment, the environmental organizations "had to submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by" the alleged activity, "but also that one or more of [their] members would thereby be directly affected apart from their special interest in th[e] subject." *Id.* at 563 (second alteration in original) (internal quotation marks omitted); *see Summers*, 555 U.S. at 498 (describing *Lujan*'s holding on this point). Because the affidavits submitted by several individual members failed to demonstrate injury in fact or redressability, the environmental organizations, in turn, lacked associational standing. *See Lujan*, 504 U.S. at 562–71.

To be sure, *Summers* and *Lujan*, as appeals from summary judgment, involved different stages of litigation than this case. PRN appeals here from the district court's grant of Dynegy's motion to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction. As we have said, how standing is shown changes as the litigation progresses. *Lujan*, 504 U.S. at 561; *Spuhler*, 983 F.3d at 285. Recall also that at the pleading stage, we presume general allegations include the specific facts supporting the claim. *Lujan*, 504 U.S. at 561. From all this, PRN insists it has associational standing, contending that it need not provide names of any individual members at the pleading stage.

We still hold that PRN lacks associational standing. In its complaint, PRN maintains it has more than 1000 members yet fails to show at least one who has individual standing. Although "[i]ndividual members of PRN live near, study, work, and recreate in and around the Middle Fork, including in the vicinity of the Vermilion Power Station," we do not know—based on the face of the complaint—who these members are or how exactly the alleged discharges will harm them individually. PRN speaks of its individual members only as a collective, claiming that Dynegy's alleged discharges have harmed, and will continue to harm, "[t]he individuals' use and enjoyment of the Middle Fork." But presuming that at least one of these individual members has standing to sue on their own, as PRN invites us to do under *Lujan*, trends too closely to the statistical probability theory of associational standing rejected in *Summers*. *See Summers*, 555 U.S. at 498–99.

On the face of PRN's complaint, we cannot assure ourselves that at least one individual member—and not those individual members as a group—has standing to sue. Under the

"plausibility" framework for facial standing challenges, PRN's associational standing allegations are akin to impermissible speculation rather than permissible presumption, thus "stop[ping] short of the line between possibility and plausibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Just as "generalized harm to the forest or the environment will not alone support standing," generalized harm to a group of individual members will not do so for associational standing. *Summers*, 555 U.S. at 494. By failing to allege facts sufficient to show that at least one of its members could sue in their own right, PRN has failed to show that it could sue on their behalf. *See Spokeo*, 136 S. Ct. at 1547 ("Where … a case is at the pleading stage, the plaintiff must clearly … allege facts demonstrating each element." (footnote and internal quotation marks omitted)).

PRN's position is also in tension with the Federal Rules of Civil Procedure. Allowing an association to avoid showing an individual member's standing at the pleading stage would effectively shift a defendant's Rule 12(b)(1) motion into summary judgment, permitting associational plaintiffs to proceed to discovery in nearly every case. Even though courts have "an independent obligation to assure that standing exists" at each stage, *Summers*, 555 U.S. at 499, a defendant should be able to make its own standing challenge as soon as the Federal Rules of Civil Procedure permit it to do so—at the pleadings, not summary judgment. *See* FED. R. CIV. P. 12(b) (noting that, among other motions, a motion to dismiss for lack of subject-matter jurisdiction "must be made before pleading if a responsive pleading is allowed"). Other facts relevant to associational standing could be discernible only after discovery begins, to be sure. Yet standing for at least one individual

member of an association is not one of them. *See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J., sitting by designation) ("[W]hy the advocacy group would have needed formal discovery to identify which of its own members may have been injured by the regulation is a mystery the group leaves unsolved."). At the pleading stage, PRN need not establish associational standing at a level sufficient for summary judgment; it must, however, provide some way of showing that *at least one* individual member has standing to sue on their own. Like the Supreme Court, "[w]e have always insisted on strict compliance with this jurisdictional standing requirement." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Associational standing is no exception.

This court came to a similar conclusion in *Disability Rights Wisconsin, Inc. v. Walworth County Board of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008). After dismissal of its suit against the Walworth County Board of Supervisors for alleged unequal treatment of disabled children, Disability Rights Wisconsin—"a non-profit corporation created under Wisconsin law in order to '[p]ursue legal, administrative and other appropriate remedies to ensure the protection of the rights of persons with developmental disabilities or mental illness'"—appealed the district court's determination that it lacked associational standing. *Id.* at 798, 799 (quoting WIS. STAT. § 51.62(3)(a)(1)). This court affirmed. *Disability Rights Wis., Inc.*, 522 F.3d at 804. Because that organization failed to "identify any Walworth County disabled student with standing to bring suit based on the Board of Supervisors' conduct" in its first amended complaint, it did not "satisfy the first requirement of *Hunt*, and therefore [did] not establish[] associational standing." *Id.* "[A]dvocacy," this court explained, "is only appropriately—

and constitutionally—undertaken on behalf of another when that other has suffered an injury." *Id.* So too here.

A comparison to our recent decision in *Shakman v. Clerk of Cook County*, where associational standing was satisfied, also shows what PRN is missing. 994 F.3d 832, 840–41 (7th Cir. 2021). That case concerned a pair of decades-old consent decrees monitoring political patronage practices in Chicago. *Id.* at 835–37. In analyzing the associational standing of a voters organization to enforce the consent decrees, we first examined the individual standing for one of its members, George Tserotas. *Id.* at 840–41. Because Tserotas "ha[d] an interest in a workplace free of patronage and has sustained or faced the threat of injury-in-fact," the voters organization met associational standing's first requirement that one of its members have individual standing. *Id.* at 841. Although *Shakman* had a different procedural posture, that decision underscores the importance of an individual member's standing to associational standing.

All told, standing for at least one individual member remains an essential component of associational standing at each stage of litigation. *See United Food*, 517 U.S. at 555; *Hunt*, 432 U.S. at 343. True, in *Disability Rights Wisconsin, Inc.*, this court noted that the requirement for an individual member to have standing "still allows for the member on whose behalf the suit is filed to remain unnamed by the organization." 522 F.3d at 802 (citing *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999)). We reserve for another day whether that statement survives *Summers*, which followed *Disability Rights Wisconsin, Inc.* and *Stincer*. Indeed, other courts have read *Summers* to expressly require names for associational standing on the pleadings. *See, e.g.*, *Draper*, 827 F.3d at 3 (noting, on an appeal from

a motion to dismiss, that for associational standing, "the asso-
ciation must, at the very least, 'identify [a] member[] who
ha[s] suffered the requisite harm.'" (alterations in original)
(quoting *Summers*, 555 U.S. at 499)); *S. Walk at Broadlands
Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713
F.3d 175, 184 (4th Cir. 2013) (explaining, on an appeal from a
motion to dismiss, that a homeowners association had "failed
to identify a single *specific member*" and that "[t]his failure to
follow the requirement articulated in *Summers* would seem to
doom its representational standing claim" while rejecting at-
tempts to evade *Summers*). But even without names, PRN has
failed to show associational standing on the face of its com-
plaint.

## B

When PRN filed its opening brief, it moved for leave to file
documents and attached supplemental declarations from sev-
eral of its individual members and staff. In a footnote in
*Summers*, the Supreme Court declined to consider the same
type of documents submitted here. 555 U.S. at 495 n.* ("After
the District Court had entered judgment, and after the Gov-
ernment had filed its notice of appeal, respondents submitted
additional affidavits to the District Court. We do not consider
these."). As the Court explained, "[i]f [the environmental or-
ganizations] had not met the challenge to their standing at the
time of judgment, they could not remedy the defect retroac-
tively." *Id.* Unlike in *Summers*, though, PRN's standing had
not been challenged before this appeal. If Dynegy challenged
standing in the district court, then PRN would have filed sup-
plemental declarations like it asks to now, or so PRN asserts.

But PRN misapprehends its standing burden. Even
though PRN faults Dynegy for not challenging standing in the

district court, the plaintiff, not the defendant, must establish standing "at each stage of the litigation." *Bazile*, 983 F.3d at 278; *see Warth v. Seldin*, 422 U.S. 490, 518 (1975) ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."). And like any other plaintiff, PRN "is the master of [its] own complaint." *Mordi v. Zeigler*, 870 F.3d 703, 707 (7th Cir. 2017). So we take PRN at its word: If it could have filed similar supplemental declarations (or even made similar allegations in the complaint) at the pleading stage, then it should have done so. *See Summers*, 555 U.S. at 500 (noting that Federal Rule of Civil Procedure 15(d) does not "permit[] the supplementation of the record, in the circumstances here: after the trial is over, judgment has been entered, and a notice of appeal has been filed" (emphasis omitted)).

In other words, Dynegy's failure to challenge standing in the district court does not excuse PRN's lack of standing on the face of its complaint and does not permit PRN to supplement that complaint on appeal. *Cf. Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 656 (7th Cir. 2011) ("[A] plaintiff, to establish Article III standing to sue, must allege, and if the allegation is contested must present evidence, that the relief he seeks will if granted avert or mitigate or compensate him for an injury—though not necessarily a great injury—caused or likely to be caused by the defendant." (emphasis omitted)). As discussed, even without contest in the district court, PRN's complaint is facially deficient as to associational standing. In its motion for leave to file declarations, which came at the same time as its opening brief, PRN even recognized the standing defect in its complaint: "To meet its burden to demonstrate Article III standing before this Court,

Prairie Rivers Network seeks leave to file the attached decla-rations as a supplement to the appellate record."[5] Like the Court in *Summers*, we will not let PRN "remedy the defect ret-roactively" after the district court entered final judgment. 555 U.S. at 495 n.*

Our conclusion is also in harmony with the plain text of Federal Rule of Appellate Procedure 10(e)(2), which provides:

> If anything material to either party is omitted from or misstated in the record by error or acci-dent, the omission or misstatement may be cor-rected and a supplemental record may be certi-fied and forwarded:
>
>> (A) on stipulation of the parties;
>>
>> (B) by the district court before or after the record has been forwarded; or
>>
>> (C) by the court of appeals.

FED. R. APP. P. 10(e)(2). PRN's declarations were not "omitted from or misstated in the record by error or accident" but ra-ther absent from the district court record entirely. *Id.*; *see United States v. Acox*, 595 F.3d 729, 731 (7th Cir. 2010) ("A court of appeals is limited to the record built in the district court, so arguments that depend on extra-record information have no prospect of success."). Rule 10(e) is permissive, but as a gen-eral rule we will not consider evidence on appeal that was not before the district court. *See Midwest Fence Corp. v. United States Dep't of Transp.*, 840 F.3d 932, 946 (7th Cir. 2016). We thus decline to consider PRN's supplemental declarations

---

[5] Dynegy's Motion for Leave to File Documents, CA7 ECF No. 20, p. 3, ¶ 6.

filed after entry of the judgment appealed. *See, e.g.*, *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (noting, on an appeal from summary judgment, that "[i]n determining whether the [plaintiffs] have standing, the court may not consider on appeal supplemental declarations filed after entry of the judgment appealed"); *see also* 16A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3956.1 (5th ed.).[6]

## III

For these reasons, we DENY Prairie River Network's motion for leave to file documents and AFFIRM on different grounds the district court's dismissal for lack of jurisdiction. A jurisdictional dismissal is without prejudice, *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 969 (7th Cir. 2016), so PRN may file a new complaint.

---

[6] We acknowledge the significance of *County of Maui* for Clean Water Act claims and appreciate the *amici curiae* who have weighed in on that topic. Because we decide this case on standing, how to apply that decision's multi-factor test for functional discharges is a question for another day. *See Cnty. of Maui*, 140 S. Ct. at 1476–77.