In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 19-3234, 19-3428, 19-3516, 20-1053 & 20-1503

BIG SHOULDERS CAPITAL LLC,

*Plaintiff-Appellee,*

*v.*

SAN LUIS & RIO GRANDE RAILROAD, INC. and MT. HOOD RAIL-
ROAD CO.,

*Defendants-Appellees.*

APPEALS OF: SANDTON RAIL COMPANY LLC, SAN LUIS
CENTRAL RAILROAD CO., RALCO LLC, SOUTH MIDDLE CREEK
ROAD ASSOCIATION, THE BOARD OF COMMISSIONERS, RIO
GRANDE COUNTY, RAILWORKS TRACK SERVICES, INC., and
RAILWORKS SIGNALS, COMMUNICATIONS, INC., and THE AD
HOC COMMITTEE OF THE UNSECURED CREDITORS

and

CROSS-APPEAL OF: NOVO ADVISORS and FOX ROTHSCHILD,
LLP.

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19 CV 06029 — **Thomas M. Durkin**, *Judge*.

———————————

ARGUED FEBRUARY 18, 2021 — DECIDED SEPTEMBER 3, 2021

Before BRENNAN, SCUDDER, and KIRSCH, *Circuit Judges*.

BRENNAN, *Circuit Judge*. This labyrinth of appeals stems from a breach of contract claim brought by Big Shoulders Capital LLC against San Luis & Rio Grande Railroad Inc. (SLRG) and Mt. Hood Railroad Co., with federal jurisdiction ostensibly based on diversity of citizenship. In its complaint, Big Shoulders requested that the district court appoint a receiver to handle SLRG's assets. That court did so, which brought the case to the attention of the several creditors who have interests in entities in the same corporate group as SLRG and Mt. Hood. One of these parties, Sandton Rail Company LLC, intervened and challenged the appointment of the receiver as well as the district court's jurisdiction. Sandton alleged that Big Shoulders failed to join necessary parties who, if added, would destroy diversity of citizenship.

Meanwhile, other creditors—referred to here as Petitioning Creditors—filed an involuntary bankruptcy petition on behalf of SLRG in federal bankruptcy court in Colorado. The receiver objected. Because the judicially approved receivership agreement contained an anti-litigation injunction, the district court initially concluded that the bankruptcy petition was void. On reconsideration, however, the district court determined that it did not have authority to enjoin the bankruptcy. So the bankruptcy continued, and after Big Shoulders refused to continue to fund the receivership, the district court approved its termination.

Out of these circumstances come several appeals. Sandton brings the main appeal which claims the district court lacked subject matter jurisdiction over the entire contract dispute

because—contrary to the original pleadings—Big Shoulders, SLRG, and Mt. Hood all have Illinois citizenship. The other appeals relate to the bankruptcy petition and the district court's decision to first enforce the anti-litigation injunction but then to allow the bankruptcy to proceed. In another layer of complexity, each appeal also involves questions of standing or mootness.

In the end, those justiciability questions require us to dismiss all but Sandton's appeal. As for Sandton's argument that diversity jurisdiction is lacking, we remand to the district court for an application in the first instance of the "nerve center test" to determine if SLRG and Mt. Hood are citizens of Illinois.

## I. Background

This procedural maze started with a breach of contract action, made its first turn with the appointment of receiver, banked left when the petitioning creditors filed an involuntary bankruptcy for SLRG, and ended with the termination of the receivership.

### A. Breach of Contract

This case began when Big Shoulders sued SLRG and Mt. Hood, alleging a breach of contract and more than $4.6 million in damages. That contract was a loan agreement between Big Shoulders, the defendants, and Iowa Pacific Holdings LLC, as well as several of its subsidiaries. Iowa Pacific is the ultimate parent company of SLRG and Mt. Hood, along with several other entities.[1] As relevant here, SLRG and Mt. Hood,

---

[1] Mt. Hood Railroad is wholly owned by SLRG, SLRG is wholly owned by Permian, and Permian is wholly owned by Iowa Pacific.

operators of various railroads in the United States, are financially distressed.

In its complaint, Big Shoulders contended that federal jurisdiction existed because there was complete diversity of citizenship between the parties. *See* 28 U.S.C. § 1332. As a limited liability company, Iowa Pacific is the citizen of the states where its owning members are citizens. *See West v. Louisville Gas & Elec. Co.*, 951 F.3d 827, 829 (7th Cir. 2020). One of its members is a citizen of Illinois, and Big Shoulders is also a citizen of Illinois. So if Big Shoulders sued Iowa Pacific, there would not be complete diversity. But according to Big Shoulders, the entities that it sued—SLRG and Mt. Hood—are citizens of Colorado and Delaware, and Oregon, respectively, making jurisdiction facially proper.

For relief, Big Shoulders also asked the district court to appoint Novo Advisors as a receiver. Big Shoulders agreed to fund the receivership to keep the railroads operational during the lawsuit. It argued that without a receiver, the railroad might not have enough assets to cover a judgment in Big Shoulders' breach of contract case. The district court granted the motion. But since filing its complaint, Big Shoulders has taken no steps to prosecute the breach of contract action. SLRG and Mt. Hood have not responded to the complaint, either.

### B. Receiver's Activities

Five days after appointment by the district court, the receiver asked to expand the receivership. The district court

agreed. The Petitioning Creditors,[2] the Ad Hoc Committee,[3] and Sandton had interests in several entities within the expanded receivership. These new receivership entities, like SLRG and Mt. Hood, are subsidiaries of Iowa Pacific. Some of these entities—such as Heritage Rail Leasing, LLC (Heritage)—are citizens of Illinois. But expanding a receivership to include non-parties that are not diverse from the plaintiff does not necessarily destroy diversity jurisdiction. *Cf. Alonso v. Weiss*, 932 F.3d 995, 1002 (7th Cir. 2019) (noting that the district court has ancillary jurisdiction over claims in a receivership, including those that neither contain a federal question nor involve completely diverse parties). All in all, the receivership eventually included more than 20 companies.[4] The receivership agreements, approved by the district court, also

---

[2] Included are San Luis Central Railroad Co.; Ralco LLC; South Middle Creek Road Assoc.; and the Board of Commissioners, Rio Grande County.

[3] Included are Kenneth Bitten; Mid America Railcar Leasing, LLC; Johns Trains, Inc.; Protection Development Inc.; and Steam Services of America & Star Trak Inc. These are all creditors of Iowa Pacific Holdings, with claims totaling around $1.7 million. Bitten was not a party to this suit in the district court, although he filed an appearance when the district court considered the bankruptcy petition discussed further below.

[4] Included are SLRG; Mt. Hood Railroad; Iowa Pacific Holdings, LLC; Permian Basin Railways, Inc.; Chicago Terminal Railroad Co.; Heritage Rail Leasing, LLC; Saratoga and North Creek Railway, LLC; High Iron Travel Corp.; Isla Largo, LLC; Pacific Travel Partners, Inc.; Rusk, Palestine & Pacific Railroad, LLC; The Pullman Sleeping Car Company, LLC; Piedmont Railway, LLC; Railflow, LLC; Eastern Flyer, LLC; Hoosier State Train, LLC; Santa Cruz and Monterey Bay Railway Co.; Austin & Northwestern Railroad Co. Inc.; West Texas and Lubbock Railway Co. Inc.; West Texas and Lubbock Railroad Co., Inc.; Rails End Cafe, LLC; Central Car Repair, LLC; Massachusetts Coastal Railroad, LLC; Cape Rail, Inc.; and Cape Cod Central Railroad, Inc.

contained language barring any party from "commencing, prosecuting, continuing or enforcing any suit or proceeding against or affecting Defendants or any part of the Receivership Assets."

When the district court appointed the receiver, Sandton moved to intervene and to dismiss for lack of subject matter jurisdiction. Sandton's request to intervene was based on its wish to preserve its right to a $3.2 million consent judgment against various receivership entities. In its motion to dismiss, Sandton argued that Big Shoulders failed to join necessary parties, particularly several Iowa Pacific subsidiaries that would destroy diversity jurisdiction. The district court granted the motion to intervene but denied the motion to dismiss. Under Illinois contract law, the district court explained, a party suing for breach of contract may sue any one of the obligated parties and need not sue all of them. According to the district court, this meant that Big Shoulders could choose to sue SLRG and Mt. Hood but not Iowa Pacific. Sandton does not contest that holding on appeal.

After the district court dealt with Sandton's motions, the receiver entered into an agreement with the Internal Revenue Service. That agreement allowed the IRS to treat Iowa Pacific Holdings and its subsidiaries as one enterprise for tax purposes. To enter into the IRS agreement, the receiver submitted an affidavit from Iowa Pacific's general counsel, David Michaud—referred to as the Michaud Declaration—concerning the corporate practices of its subsidiaries.

The Michaud Declaration described the receivership entities as a "single enterprise" and averred that Iowa Pacific made all decisions for its subsidiaries. According to this declaration, these subsidiaries did not maintain separate books

and records and did not transact with each other at arm's length. Concerning corporate governance, the declaration stated that only the interests of Iowa Pacific were considered and not the individual interests of the subsidiaries. The declaration further noted that most of the receivership entities were headquartered in Chicago, shared management, and failed to hold separate board meetings for several years. This document is central to Sandton's appeal.

In another action related to Sandton's appeal, the receiver rejected a lease that Sandton had with Heritage to provide railcars and other track equipment. The receivership agreement gave the receiver the power to formally reject the lease.

### C. The Bankruptcy Petition

At the same time, despite the anti-litigation provision in the receivership agreements, the Petitioning Creditors[5] filed an involuntary bankruptcy petition against SLRG in the District of Colorado. They asserted their rights as entities interested in the continued operation of SLRG. Due to SLRG's financial distress, the bankruptcy court granted the request for relief. After learning of the petition, the receiver made an emergency motion in the Northern District of Illinois district court to consider the effect of the receivership agreement injunction on the SLRG bankruptcy. Initially, the district court determined that the petition was void because it violated the injunction. The Petitioning Creditors moved for

---

[5] Despite joining the brief of the Petitioning Creditors, the Board of Commissioners, Rio Grande County did not join the bankruptcy petition. Nevertheless, because this distinction is ultimately inconsequential to our disposition of that appeal, we will treat the Board of Commissioners, Rio Grande County as one of the Petitioning Creditors.

reconsideration, arguing the district court lacked the authority to enjoin a bankruptcy proceeding. In the alternative, they requested permission from the district court to proceed with the bankruptcy.

On reconsideration, the district court determined that it did not have the power to void the bankruptcy but that the injunction remained legitimate. It also declined to officially authorize the Petitioning Creditors to continue with the bankruptcy. Because the injunction remained, the district court concluded that it retained jurisdiction over the receivership and the receivership property. Yet, even though it recognized that the Petitioning Creditors violated its injunction, the district court declined to hold them in contempt.

## D. Termination of the Receivership

Because of the continuing bankruptcy, Big Shoulders refused to fund the receivership. So the district court terminated the receivership and ordered fees to be paid to the receiver and to those the receiver had paid for their services, such as Fox Rothschild LLP, a cross-appellant here. The final order also "terminated" the injunction against the involuntary bankruptcy. The result is that there is no longer a receivership in the district court and consequently no longer any injunction against a bankruptcy filing.

## II.  Discussion

Each of the appeals before us involves merits and justiciability issues:

- Sandton brings the main appeal against Big Shoulders and claims the district court lacked subject matter jurisdiction based on lack of diversity.

- Big Shoulders argues in its cross-appeal that Sandton has not demonstrated that it has standing.

- The appeals of the Petitioning Creditors, the Ad Hoc Committee, Novo Advisors, and Fox Rothschild concern the district court's handling of the Colorado bankruptcy petition.

- The Petitioning Creditors object to the district court's initial order holding the bankruptcy void, arguing that the court lacked authority to enjoin a bankruptcy proceeding. A justiciability question for their appeal is whether it is moot.

- The Ad Hoc Committee argues that after the district court reversed course and determined that the bankruptcy was not void, the district court lacked jurisdiction over the receivership.

- Novo Advisors and Fox Rothschild contend in their cross-appeal that the Ad Hoc Committee lacks standing to bring this claim. Novo advisors and Fox Rothschild also argue that the district court never lost jurisdiction because the Petitioning Creditor's bankruptcy petition was invalid under the collateral bar doctrine. For their appeal, a threshold question is whether it is moot.

A procedural and appellate labyrinth, indeed. First, we address the justiciability questions in each appeal. Because we

reach only jurisdictional issues, our review is de novo. *United States v. Muresanu*, 951 F.3d 833, 837 (7th Cir. 2020).

### A. Standing

The appeals of Sandton and the Ad Hoc Committee present standing issues. The standing doctrine is rooted in the constitutional requirement that the judicial power extends only to "cases" and "controversies." U.S. CONST. Art. III. A party must have standing in every stage of the litigation, including on appeal. *Hollingsworth v. Perry*, 570 U.S. 693, 705–06 (2013). To satisfy standing, a party must demonstrate an injury in fact that is traceable to the defendant and is redressable by a court ruling. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Intervening parties like Sandton must meet these constitutional requirements. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651, (2017). For non-parties like the Ad Hoc Committee, this court has found standing to appeal only when "the district court has ordered them to do something (as with a contempt citation issued to nonparty witnesses) or when they are agents of parties to the suit (as with attorneys seeking fees)." *Douglas v. The W. Union Co.*, 955 F.3d 662, 665 (7th Cir. 2020). Big Shoulders argues that Sandton and the Ad Hoc Committee fail the first standing requirement because they cannot show they suffered an injury in fact.

An injury in fact must be concrete and particularized as well as actual or imminent. *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019). "[T]raditional tangible harms, such as physical harms and monetary harms" will "readily qualify as concrete injuries" *Ramirez*, 141 S. Ct. at 2204. But if a concrete injury has not already occurred, a plaintiff cannot establish standing by alleging merely a *possible* future injury—rather, the injury must be "*certainly impending*."

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The plaintiff bears the burden of demonstrating a concrete (or imminent) injury. *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007–08 (7th Cir. 2021).

In cases involving the disposition of assets, as here, parties whose assets are affected by the actions of another party or a court ruling generally have standing to appeal. *See In re Wilton Armetale, Inc.*, 968 F.3d 273, 281 (3d Cir. 2020) (holding that party had standing to appeal when it complained that actions affected its ability to be paid on its claims). This includes a receiver's actions ratified by the court that make it more difficult for a third party to enforce its judgments or debts against a financially distressed defendant. *See, e.g., S.E.C. v. Enter. Tr. Co.*, 559 F.3d 649, 651–52 (7th Cir. 2009); *In re Sherman*, 491 F.3d 948, 965 (9th Cir. 2007). These are the types of pocketbook injuries alleging monetary harms that are paradigmatically concrete. *See Ramirez*, 141 S. Ct. at 2204. Both Sandton and the Ad Hoc Committee argue that actions of the receiver—ratified by the district court—affected their claims over certain assets.

### 1. Sandton's Standing

Sandton alleges two injuries. The first is that the receiver entered into an agreement with the IRS that harmed Sandton's ability to recover on its consent judgment. The second is that the receiver rejected Sandton's lease with Heritage. We conclude that the first injury is sufficiently actual and concrete to give Sandton standing, so we need not address its second proffered injury.

Before the IRS agreement, Sandton contends, the IRS had the ability to reach only Mt. Hood's assets, but the agreement expanded the number of entities the IRS could access. Recall

that Sandton has a consent judgment worth approximately $3.2 million that is recoverable against several receivership parties, including Heritage and SLRG. These entities did not previously owe money to the IRS, but they would now based on the agreement. Sandton argues the IRS agreement will therefore make it more difficult for Sandton to collect on its consent judgment. Sandton further contends this injury is traceable to the court's actions in approving a receivership and that the injury would be redressed if we dismiss the case for lack of subject matter jurisdiction. In response, Big Shoulders asserts that Sandton's injury is speculative and not concrete. To Big Shoulders, Sandton has not provided any evidence that the IRS agreement has hampered Sandton's ability to be paid on its consent judgment.

Sandton has standing. The agreement expanded the number of entities available to the IRS, which logically decreases the chance that Sandton can collect from one of those already financially distressed entities. Sandton is an unsecured creditor of these companies, so any additional creditors harm its ability to collect on its judgment. This concrete injury results in a judicially cognizable case or controversy. *See, e.g.*, *Enter. Tr. Co.*, 559 F.3d at 651–52 (holding that creditors had standing to appeal receiver's plan of destruction because it affected assets in which they had interests).

### 2. *The Ad Hoc Committee's Standing*

In its appeal, the Ad Hoc Committee supports its standing with a similar argument to Sandton's. The Committee asserts that the receivership affected assets in which its creditors have a stake. Big Shoulders responds that the Committee fails to point to any specific assets affected by the termination orders from which the Committee appealed.

Because a claimant has the burden to prove standing, that party must be prepared to present specific facts evidencing a concrete injury. *Prairie Rivers Network*, 2 F.4th at 100. The Ad Hoc Committee makes only general assertions that it has been injured by the receivership. It has failed to point to any specific agreements by the receiver that affected its assets or which of its members have financial interests in this case. Nor has it shown how the fee and termination orders it is appealing affected any assets in which it had an interest. Further, unlike Sandton, the Committee is not a party to this case, and it did not move to intervene, so its standing burden is even greater. *See Douglas*, 955 F.3d at 665.

To the extent the Ad Hoc Committee contends it was injured by the anti-litigation injunction in the receivership agreement, these claims are also unavailing. Aside from mootness issues, the Committee appealed from only the fee and termination orders. It did not appeal from any order establishing an injunction. *See Teledyne Techs. Inc. v. Shekar*, 831 F.3d 936, 939 (7th Cir. 2016) ("[I]t is well established that a party seeking review of an interlocutory order cannot enlarge the time for noticing an appeal by filing a successive motion and appealing the denial of the latter motion." (internal quotation marks omitted)). In fact, the Committee appealed from the order that dissolved the injunction. As described above, the Committee has not demonstrated that it was injured by any of the consequences of the order from which it appealed. Because the Ad Hoc Committee has not met its standing burden, we dismiss its appeal.

### B. Mootness

The appeals of the Petitioning Creditors, Novo Advisors, and Fox Rothschild are each challenged as moot. An appeal is

moot when "an event occurs during appeal that eliminates the court's power to provide relief." *Stone v. Bd. of Election Comm'rs for City of Chicago*, 643 F.3d 543, 545 (7th Cir. 2011) (concluding that appeal was moot because the appellant requested an injunction against a municipal election that had already taken place). "A case that becomes moot at any point during the proceedings is no longer a Case or Controversy for purposes of Article III and is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (internal quotation marks omitted). The test for mootness "is not whether we may return the parties to the status quo ante, but rather, whether it is still possible to fashion *some* form of meaningful relief to the appellant in the event he prevails on the merits." *Flynn v. Sandahl*, 58 F.3d 283, 287 (7th Cir. 1995) (internal quotation marks omitted). So the main question is whether the party maintains a personal stake in the outcome of the appeal. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013). Answering that question requires that we look to whether a party remains injured, as well as what relief the party requests.

The Petitioning Creditors seek relief from an injunction that no longer exists. As discussed, the injunction was part of the receivership agreement and enjoined most litigation involving receivership property. The Petitioning Creditors filed their bankruptcy petition anyway. And recall that the district court first determined that the petition was void, yet it declined to hold the Petitioning Creditors in contempt. Then the district court reconsidered and determined that the petition was not void. Putting aside the inconsistency, the receivership has now been terminated by the district court. This leaves a bankruptcy continuing in the District of Colorado and no

injunction against the Petitioning Creditors—or, for that matter, any other interested party.

Appeals requesting relief from expired injunctions are generally moot. *See Home Care Providers, Inc. v. Hemmelgarn*, 861 F.3d 615, 621 (7th Cir. 2017). To determine whether that initial injunction (now, defunct) was proper would be to render what is essentially an advisory opinion, which of course is beyond the judicial power granted to the federal courts in Article III. *See Sanchez-Gomez*, 138 S. Ct. at 1537. The Petitioning Creditors also do not suffer from the possibility of any imminent future harm. The district court did not issue a contempt citation, and there is no realistic threat of one for violating an injunction that no longer exists. This posture distinguishes this case from *Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 301 (4th Cir. 2001). There, the Fourth Circuit determined that a live controversy remained because the appellants received a contempt citation and the injunction stayed in place. Here, there is neither an injunction nor a threat of contempt. The Petitioning Creditors' appeal is thus moot and must be dismissed. *See Stone* 643 F.3d at 545.

It is also unclear what remedy this court could fashion for Novo Advisors and Fox Rothschild. In their brief, they ask us to reverse the district court's reconsideration motion in part, affirm the other receivership orders, and affirm the fee and termination orders. Even if we voided the bankruptcy petition, these parties do not ask us to reinstate the receivership. They also do not ask us to halt the bankruptcy (if that is possible). The primary goal of their appeal appears to be to defend the fee and termination orders against the Ad Hoc Committee's attack. So if the Committee's appeal is moot, there is no relief to be given. At oral argument before us, Novo

Advisors and Fox Rothschild conceded as much. Given that we are dismissing the Committee's claims, we must also dismiss the appeal brought by Novo Advisors and Fox Rothschild.

In summary, the appeals of the Petitioning Creditors, the Ad Hoc Committee, Novo Advisors, and Fox Rothschild are dismissed as not justiciable.

### C. Diversity Jurisdiction

This leaves only Sandton's allegation that this case lacked diversity jurisdiction. Article III of the Constitution provides that "The Judicial Power shall extend to … Controversies … between citizens of different states." Although this constitutional grant requires only minimal diversity, the diversity jurisdiction statute, 28 U.S.C. § 1332, requires complete diversity. *Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 636 (7th Cir. 2021) (citing *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267(1806)). This means no defendant may share the same state citizenship as any plaintiff. *Id*. Both the statute and constitutional provision were ostensibly a means of protecting out-of-state defendants from prejudice in state courts due to their outsider status. *See* Henry J. Friendly, *The Historic Basis of Diversity Jurisdiction*, 41 HARV. L. REV. 483, 484 (1928) (describing the arguments made during ratification for including the diversity clause in the Constitution).

"For the purposes of [the diversity statute] a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332. The first citizenship indicator simply requires determining the state in which a corporation is registered. The

"principal place of business" language presents courts with more of a challenge. Initially, courts of appeals adopted several different tests to determine the location of a corporation's principal place of business. *See* 13F WRIGHT AND MILLER, FEDERAL PRACTICE & PROCEDURE § 3625 (3d ed. 2021). The Supreme Court eventually weighed in and adopted the "nerve center" test already in use in this and other circuits. *See Hertz Corp. v. Friend*, 559 U.S. 77, 92–93, (2010). A corporation's "nerve center" is "the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Id*. The Court concluded that the nerve center test better comported with the language of the jurisdictional statute and was easier to administer than the alternative criteria used by other courts of appeals. *Id*.

Sandton argues that complete diversity does not exist here. Recall that the initial complaint alleged Big Shoulders was a citizen of Illinois and Delaware, and that Mt. Hood and SLRG were citizens of Oregon and Colorado. That facially satisfied the complete diversity requirement. Sandton argues that despite these representations, subsequent events demonstrate that the case contains Illinois citizens on both sides of the lawsuit. Sandton's contention turns on several actions taken by the receiver. The expanded receivership included several entities that are citizens of Illinois, Sandton emphasizes, including the ultimate parent company, Iowa Pacific. To Sandton, the Michaud Declaration is evidence that the surface diversity in this lawsuit may not be all that it seems.

From these events, Sandton presents three arguments. First, Sandton argues we should treat the defendant companies as alter egos of the other receivership companies, particularly Iowa Pacific, and that we should attribute the parent's

citizenship (Illinois) to SLRG and Mt. Hood. Second, Sandton contends the Michaud Declaration demonstrates that the receivership companies are a single enterprise headquartered in Chicago, so we should conclude that Illinois is the defendants' principal place of business. Third, Sandton asserts SLRG and Big Shoulders colluded to establish diversity jurisdiction before filing the case. Because we remand for the district court to apply the "nerve center test," we reach only the first two arguments.

### 1. *Alter Ego Theory*

Typically, courts use an alter ego theory as a means of "piercing the corporate veil" for liability purposes, but some courts have expanded this doctrine to the diversity jurisdiction context. *See, e.g.*, *Kuehne & Nagel (AG & Co) v. Geosource, Inc.*, 874 F.2d 283, 291 (5th Cir. 1989). For those courts, when a parent or subsidiary is the mere instrumentality of the other corporation, both corporations should have their citizenship attributed to each other to limit diversity jurisdiction. *See Rouhi v. Harza Eng'g Co.*, 785 F. Supp. 1290, 1295 (N.D. Ill. 1992). According to Sandton, the statements in the Michaud Declaration that the Iowa Pacific companies do not respect corporate separateness and that their holding company controls all decision-making demonstrate that the defendant subsidiaries in this case are alter egos of Iowa Pacific and its other subsidiaries. So in Sandton's view, the Illinois citizenship of Iowa Pacific and several of its subsidiaries should be attributed to the defendants.

Sandton's position implicates a jurisdictional issue of immense complexity. *See, e.g., Boim v. American Muslims for Palestine*, -- F.4th --, 2021 WL 3616070 (7th Cir. Aug. 16, 2021) (considering whether new lawsuit against alleged alter ego

company falls within scope of federal question jurisdiction). That issue includes some fine distinctions about how direct liability, of which alter ego is one form, and vicarious liability (like veil piercing), apply, *see id.* at *5, here, under diversity jurisdiction.

To not overcomplicate this inquiry, we do not see this case as the occasion to resolve this question with its subtle distinctions. Given the nerve center test, and how it answers the principal place of business question, the alter ego theory need not be addressed or resolved. Even more, in its submissions Sandton has not explained how the principal place of business analysis should be navigated under the alter ego theory. So we decline Sandton's invitation to incorporate this concept into a proper diversity jurisdiction analysis under 28 U.S.C. § 1332. We prefer jurisdictional rules to be as clear and straightforward as possible. *See Holmstrom v. Peterson*, 492 F.3d 833, 840 (7th Cir. 2007). In this case, applying the "nerve center" test accounts for many of the same concerns as does applying the alter ego doctrine.

### 2. Nerve Center Test

That leads us to Sandton's argument that we should instead determine that either SLRG or Mt. Hood's principal places of business are in Illinois on a theory that this is where the "single enterprise" of the Iowa Pacific companies is located. The general rule is that a "subsidiary corporation which is incorporated as a separate entity from its parent corporation is considered to have its own principal place of business." *Schwartz v. Elec. Data Sys., Inc.*, 913 F.2d 279, 283 (6th Cir. 1990). If we do not adopt the alter ego theory, we must determine the potentially separate principal places of business of Mt. Hood and SLRG. Sandton avers that they are both

located in Illinois because that is where the Michaud Declaration alleged the "single enterprise" of the Iowa Pacific companies is located. Big Shoulders argues that we should instead adhere to the allegations in the complaint that Mt. Hood and SLRG have principal places of business in Oregon and Colorado.

A corporation's nerve center is its brain and synonymous with its executive headquarters. *Illinois Bell Tel. Co. v. Glob. NAPs Illinois, Inc.*, 551 F.3d 587, 590 (7th Cir. 2008). The nerve center must be "the actual center of direction, control, and coordination … and not simply an office where the corporation holds its board meetings." *Hertz Corp.*, 559 U.S. at 93. This may not always be where the corporation implements the directions from its executives. Sometimes a corporation will conduct many of its "on the ground" operations in one state but its principal place of business will be in another. *Id*. at 96.

Doctrinal tension exists here. On the one hand, separate corporate forms deserve a presumption of validity*. See Pyramid Sec. Ltd*., 924 F.2d at 1120. Some decisions stress that a subsidiary should be allotted a separate principal place of business "even where the parent owns all the stock of the subsidiary and exercises close control over its operations." *Schwartz*, 913 F.2d at 283. On the other hand, the nerve center test looks to where the corporation is directed and controlled to determine its principal place of business as well as subsidiary corporations wholly owned and controlled by parent corporations. *Page*, 2 F.4th at 635. This could result in many subsidiary corporations having the same principal place of business as their parent corporations, and as a result, weaken their separate corporate form.

The resolution is to apply the nerve center test by focusing only on the operations of the subsidiary. If the subsidiary is wholly owned by its parent corporation but also has its own executives in a different state, this other state should be the subsidiary's principal place of business. *See Topp v. CompAir Inc.*, 814 F.2d 830, 835 (1st Cir. 1987) (applying this analysis and determining that although the parent of the defendant subsidiary exercised substantial control, the subsidiary's operations were in a separate state). If, however, a subsidiary does not have any high-level operations outside of the state where its parent resides and it is "directed and controlled" from the state where the parent has its headquarters, the subsidiary's principal place of business should be in the same state as its parent. *Id*. In a circumstance where the corporate form has been disregarded, and the subsidiary and the parent are not truly separate, the subsidiary is likely to have its principal place of business where the parent does. *See, e.g., Beightol v. Capitol Bankers Life Ins. Co.*, 730 F. Supp. 190, 195 (E.D. Wis. 1992). In this way, the alter ego doctrine and the nerve center test converge.

We think it is best here for the district court to apply the nerve center analysis in the first instance. Sandton did not present its nerve center argument in the district court. An analysis under the nerve center test is fact specific, and the district court is in the best position to make such determinations. In doing so, the district court can consider to what extent the Michaud Declaration addresses the location of the nerve centers of Mt. Hood and SLRG in Illinois. That declaration states that all decisions for all the subsidiaries are made by Iowa Pacific, and that most of the companies are headquartered in Chicago. These averments require investigation by the district court on remand.

### III.  Conclusion

Under the reasoning above, we DISMISS the appeals of the Petitioning Creditors, the Ad Hoc Committee, Novo Advisors, and Fox Rothschild because they lack standing or their claims are moot. We REMAND for consideration Sandton's jurisdictional argument so the district court can apply the nerve center test.